# Exhibit B

Videotaped Deposition of

# Virginia B. Evans

June 01, 2021

Volume I

United States of America

vs.

Gilead Sciences, Inc.



www.aptusCR.com  |  866.999.8310

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3  UNITED STATES OF AMERICA,      )
    CALIFORNIA, ILLINOIS, NEW      )
 4  JERSEY, NEW YORK and TEXAS,    )
    ex rel. CHRIS PURCELL and      )
 5  KIMBERLY GROOME,               )  Case No.:
                                   )  2:17-cv-3523-MAK
 6              Plaintiffs,        )
                                   )
 7  vs.                            )
                                   )
 8  GILEAD SCIENCES, INC.,         )
                                   )
 9              Defendant.         )
    _____)
10
11
12
13        REMOTE VIDEOTAPED EXPERT DEPOSITION OF
14                 VIRGINIA B. EVANS
15                     VOLUME I
16             TUESDAY, JUNE 1ST, 2021
17
18
19
20  REPORTED BY:
    MONICA LEPE-GEORG
21  CSR No. 11976
    APPEARING REMOTELY FROM CLOVERDALE, CALIFORNIA
22
    Job No. 10083544
23
24
25
```

**Page 2**

```
 1
 2
 3          REMOTE VIDEOTAPED EXPERT DEPOSITION OF
 4  VIRGINIA B. EVANS, VOLUME NO. I, held at the
 5  location of the witness, taken on behalf of
 6  Defendant, beginning at 10:15 a.m. and ending at
 7  6:40 p.m., on Tuesday, June 1st, 2021, before Monica
 8  Lepe-Georg, Certified Shorthand Reporter No. 11976.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  REMOTE APPEARANCES
 2
 3  FOR PLAINTIFFS:
 4       SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
 5       BY:  JAMES C. SHAH, ESQ.
 6       1845 Walnut Street, Suite 806
 7       Philadelphia, Pennsylvania 19103
 8       Telephone:  610.891.9880
 9       E-mail:  jshah@sfmslaw.com
10
11  FOR DEFENDANTS:
12       PAUL WEISS
13       BY:  RANDY LUSKEY, ESQ.
14       943 Steiner Street
15       San Francisco, California 94117
16       Telephone:  628.432.5112
17       E-mail:  rluskey@paulweiss.com
18       - and -
19       PAUL WEISS
20       BY:  JIN U. KIM, ESQ.
21       1285 Avenue of the Americas
22       New York, New York 10019-6064
23       Telephone:  212.373.3808
24       E-mail:  jkim@paulweiss.com
25
```

**Page 4**

```
 1  REMOTE APPEARANCES (Continued):
 2
 3  FOR DEFENDANT:
 4       ORRICK, HERRINGTON & SUTCLIFFE LLP
 5       BY:  MARNEE R. RAND, ESQ.
 6       Columbia Center
 7       1152 15th Street, N.W.
 8       Washington, D.C. 20005-1706
 9       Telephone:  202.339.8536
10       E-mail:  mrand@orrick.com
11
12  Also Present:
13       Spencer Benveniste, Videographer
14       Rachel Gupte
15       Alvina Hou
16
17
18
19
20
21
22
23
24
25
```

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 4 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 61

1  BY MR. LUSKEY:
2    Q.  You didn't review the -- the data or the
3  spreadsheets that Gilead collected and produced on
4  that topic?
5    A.  I believe I did, but I don't -- I can't
6  recall at this point.  I can't recall the
7  specific...
8    Q.  All right.  You didn't -- you didn't cite
9  to this document in your report, right?
10   A.  I don't think so.
11   Q.  Why not?
12   A.  I had thousands of documents that I was
13  looking at, sir, and I just -- you know, I just
14  didn't cite to all of them, so...
15   Q.  Right, but those where you found examples
16  of, sort of, effective compliance communication
17  coming from senior management, did you think that
18  those would be important to cite in your objective
19  review of the compliance program?
20     MR. SHAH:  Objection.
21     THE WITNESS:  I think I would have, if it
22  had been an effective communication.  I did not
23  consider this an effective communication because,
24  like many other compliance issues at Gilead, it was
25  not implemented and there didn't seem to be any

Page 62

1  corrective action and continuous improvement in this
2  area.
3  BY MR. LUSKEY:
4    Q.  You say it was not -- excuse me?
5    A.  I'm sorry?
6    Q.  Oh, so you say it was not implemented.
7  This document talks about how if there is a TS that
8  exceeds the meal limit, there will be an e-mail
9  communication and verbal coaching from sales
10  leadership and business conduct.  Didn't you review
11  the e-mails showing that that happened each time
12  there was an overage?
13   A.  I didn't review all of the e-mails, no.  I
14  will say I -- I looked for a therapeutic specialist
15  being let go because of a consistent pattern of
16  noncompliance, whether it be meal overages or other
17  issues, and could not find that, except for very
18  isolated circumstances.
19   Q.  Did you find any evidence that there was a
20  sales rep that was exceeding the meal cap so
21  frequently that they should have been let go?
22   A.  Well, I don't know.
23   Q.  Okay.  And Ms. Groome forwards this e-mail
24  to her entire team at the top.  We can scroll back
25  up to the top.

Page 63

1    A.  Uh-hm.
2    Q.  And she states:  "I cannot say it better
3  than Jeremy states below.  Please carefully review
4  Jeremy's e-mail.
5       If you have -- if you have any questions,
6  please call me.  I am certain this is more of a
7  reminder as this team is extremely compliant with
8  all aspects of BC, and we, as a region, operate
9  daily within BC constraints -- constraints with no
10  space for wiggle room."
11      Based on your review of the evidentiary
12  record in this case, do you agree with Ms. Groome's
13  statement that her team was extremely compliant with
14  all aspects of business conduct?
15   A.  No.
16   Q.  Why do you disagree with Ms. Groome?
17   A.  Well, for one thing, Ms. Groome's team, as
18  did other teams involved in HBV speaker programs,
19  had a continuous pattern of inviting inappropriate
20  attendees to the speaker programs.  They went beyond
21  the meal limits on a pretty -- you know, not an
22  irregular basis, but that was not something that
23  was -- that I felt was being addressed effectively.
24  They also had a problem with speaker programs where
25  there were many, many repeat attendees and they

Page 64

1  were -- they were not reporting -- as you've pointed
2  out yourself, they were not reporting noncompliance
3  to the business conduct folks on a regular basis.
4  So, no, I don't -- I don't think that her team was
5  particularly compliant and I don't think that other
6  teams were compliant either.
7    Q.  So you -- you believe that Ms. Groome
8  conveyed inaccurate information to her sales team in
9  this e-mail on April 30th, 2016, correct?
10   A.  Inaccurate?
11   Q.  Correct.
12   A.  Yeah, I think that's right.
13   Q.  And she goes on to say, "We, as a region,
14  operate daily within BC constraints, with no space
15  for wiggle room."
16      Your testimony is that you also don't agree
17  with that statement, correct?
18   A.  No.  My testimony would be that I found
19  that the operations of sales and marketing with
20  respect to its speaker programs did not comply with
21  the business conduct from the start and so I -- I
22  could not agree with her statement, yeah.
23   Q.  And she goes on to say, "Thank you for your
24  ongoing attention to all aspects of BC, for working
25  and excelling in your roles by staying in BC, and

Page 65

1  for all that you do to drive sales while keeping the
2  company safe."
3       Is this an example of the type of
4  compliance communication between therapeutic
5  specialists and their managers that you talked about
6  on page 69 of your report?
7  A.  No.
8  Q.  Why not?
9  A.  Because I think this is -- you know, I just
10  don't think that this --
11       First of all, I don't believe that it's
12  accurate and I don't believe it recognizes the
13  compliance risks and brings them to the therapeutic
14  specialist's attention in a way that is designed to
15  correct problems, and a compliance program should be
16  proactive, should be moving towards eliminating
17  risk.  Identifying, preventing and eliminating
18  risks.
19  Q.  Got it.  So Ms. Groome forwarding an e-mail
20  from her boss, which indicated that Gilead's
21  business conduct department would be monitoring meal
22  spend on a quarterly basis and enforcing rules
23  relating to meal overages, is not an example of
24  identifying risks for the sales force and
25  establishing communication about how to manage those

Page 66

1  risks?
2       MR. SHAH:  Object to form.
3       THE WITNESS:  Well, I don't think that it
4  was -- I don't think it was implemented.  I think
5  that, in fact, some witnesses testified that there
6  was a -- a certain ethic of kind of papering over
7  issues or not putting things in writing.  I don't
8  think that this e-mail was accurate and -- so I
9  stand by that.
10  BY MR. LUSKEY:
11  Q.  You didn't answer the question.
12       I understand you don't think Ms. Groome's
13  e-mail was accurate about her team operating within
14  BC, but my question is different.
15       You say, in your report, that you found no
16  examples of compliance communication between TSs and
17  their managers and, you know, the business conduct
18  department about speaker programs.  Why isn't this
19  an example of one of those communications?
20  Mr. Schmalzle's e-mails, business conduct is going
21  to be monitoring meal spend, we're going to be
22  looking at it quarterly.  You're going to get
23  coaching if you have even a single overage.  And
24  then you've got a regional director sending that out
25  to an entire sales force.  What's wrong with that?

Page 67

1  A.  Well, it wasn't effective.  It didn't work,
2  right?
3  Q.  But -- but you're not -- well -- so we'll
4  get to implementation in a moment.  I disagree with
5  you, but we can talk about that.  But I'm talking
6  about the -- the prong or the opinion that you offer
7  about communications to the sales force.  And you
8  say that you found no examples of this type of
9  communication.  Why isn't this one of them?
10  A.  Well, I -- I just -- I don't think --
11       MR. SHAH:  Object to form.  Asked and
12  answered.
13       You can answer.
14       THE WITNESS:  Yeah.  I'd have to go back
15  down and see what -- what was said, but -- but I
16  think the point that I would make is that it may
17  have been a communication and so another example
18  would be training.  There was information in the
19  training slides that was facially appropriate, but
20  the bottom line was the compliance program was not
21  effective because its statements, although
22  well-intentioned as they may be, were not followed
23  up on, and the problem that is identified in the
24  e-mail from Mr. Schmalzle continued, so I -- I
25  didn't see it as an effective communication.

Page 68

1       MR. LUSKEY:  Understood.  Let's look at
2  another one of these --
3       THE WITNESS:  May I just --
4       MR. LUSKEY:  Yeah?
5       THE WITNESS:  Can I have a comfort break?
6       MR. LUSKEY:  Oh, of course.  Absolutely.
7  Sorry, we've been going an hour and a half.
8       Let's go off the record.
9       THE WITNESS:  Okay.  I'll be back in two
10  minutes.
11       MR. LUSKEY:  No, it's okay.  You can take
12  -- you can take -- we can take a 10-minute break.
13       MR. SHAH:  Why don't we take a 10-minute --
14       Is that appropriate for you, Randy?
15       MR. LUSKEY:  Of course.
16       THE VIDEOGRAPHER:  Okay.  The time is
17  8:33 -- I'm sorry, 11:33 a.m.  We are off the
18  record.
19       (Short recess was taken from 11:33 a.m.
20       until 11:43 a.m.)
21       THE VIDEOGRAPHER:  Back on the record.  The
22  time is 11:43 a.m.
23  BY MR. LUSKEY:
24  Q.  Ms. Evans, you note on page 1 of your
25  report that you were engaged by the Miller Shaw law

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 6 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 73

1    You can answer.
2    THE WITNESS:  Since -- since May of 2020,
3  did they send me e-mails?
4  BY MR. LUSKEY:
5    **Q.  Since the beginning of your retention in**
6  **this matter, did relators' counsel send you any**
7  **e-mails in which they provided you facts or data**
8  **that you considered in forming your opinions in this**
9  **case?**
10    A.  No, Mr. Luskey.  The way -- the way that we
11  handled the information exchange is that I would be
12  given access to a website that was protected and a
13  password and -- in order to get into that website, I
14  had to use the password, but I -- you know, there
15  was not a tranche of materials that were sent to me
16  by e-mail.  So, occasionally, if I couldn't find
17  something, I might say, you know, can you help me
18  locate this, do you have the number for it, or
19  something like that, but no.  So that's how that
20  worked.
21    **Q.  So I understand that you had access to that**
22  **database, but separate from that data -- database,**
23  **your under-oath testimony today is that relators'**
24  **counsel never sent you any e-mail where they**
25  **provided you any facts or data that you considered**

Page 74

1  in forming your opinions in this case?
2    A.  Not -- not that I can recall, sir, no.
3    **Q.  Okay.**
4    A.  It was all handled through the -- the
5  uploads.
6    **Q.  Okay.  Okay.  We'll talk in a moment about**
7  **your ultimate --**
8    A.  Oh, I'm sorry.  There is one thing.  There
9  was -- they asked me to look at an -- a opinion that
10  I have cited in my report that has to do with -- it
11  was a research study that was done, having to do
12  with statins and the use of payments to physicians
13  and whether or not that increased their likelihood
14  to prescribe statins, and I did look for that.  I
15  couldn't find it, and so that was one document that
16  was sent to me by e-mail, but that -- that's all I
17  can recall.
18    **Q.  Okay.  Thank you.**
19    **We'll talk in a moment about your ultimate**
20  **conclusions regarding the effectiveness of Gilead's**
21  **compliance program, but I first want to make sure**
22  **that we are crystal clear regarding some topics**
23  **about which you will not be offering an expert**
24  **opinion, so please let me know if I have these**
25  **correct.**

Page 75

1    **You are not offering an expert opinion that**
2  **any doctor submitted a false claim to Medicare for**
3  **Viread or VEMLIDY, correct?**
4    A.  That is correct.
5    **Q.  And you are not offering an expert opinion**
6  **that Gilead ever caused any doctor to submit a false**
7  **claim for reimbursement, correct?**
8    A.  That is correct.
9    **Q.  And you are not offering an expert opinion**
10  **that any particular Gilead employee knowingly paid**
11  **remuneration to a doctor to induce or reward**
12  **prescriptions, correct?**
13    A.  That is -- that is correct.  I'm not -- I'm
14  not -- not looking at the facts of the compliance
15  programs.
16    **Q.  Well, you're certainly looking at the**
17  **facts, right?  Part of your --**
18    A.  Right.
19    **Q.  -- methodology in this case was to review**
20  **the evidence, but my question was:  Based on your**
21  **review of those facts, you don't plan to offer an**
22  **expert opinion in this case that you have concluded**
23  **that a Gilead employee knowingly paid remuneration**
24  **to a doctor to induce or reward prescriptions,**
25  **correct?**

Page 76

1    A.  That's correct.
2    **Q.  And you're not offering an expert opinion**
3  **that any Gilead employee knowingly conducted sham**
4  **speaker programs, right?**
5    A.  I have not offered that opinion, no.  I'm
6  looking at the compliance program.
7    **Q.  Okay.  And you're not offering an opinion**
8  **that Gilead violated the Anti-Kickback Statute,**
9  **correct?**
10    A.  That is correct.
11    **Q.  And you're not offering an opinion that**
12  **Gilead violated the False Claims Act, correct?**
13    A.  That is correct.
14    **Q.  Are you offering an opinion that Gilead**
15  **knowingly or willfully violated the law?**
16    A.  No, I'm not.  I'm -- I would offer the
17  opinion that Gilead knowingly failed to comply with
18  its own policies and the industry standards and the
19  OIG's -- sub OIG's regulatory guidance.
20    **Q.  Understood.  So you plan to offer an**
21  **opinion at trial in this case that Gilead knowingly**
22  **did those things?**
23    A.  Based on the actions of its employees --
24    MR. SHAH:  Object to form.
25    You can answer.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK   Document 234-2   Filed 06/14/21   Page 7 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 77

1    THE WITNESS: Yes, based on the actions of
2  its employees.
3  BY MR. LUSKEY:
4    Q.  You plan to opine on Gilead's state of
5  mind?
6    A.  No, the actions of its employees.
7    Q.  You just testified that you plan to offer
8  an opinion at trial that Gilead knowingly violated
9  the law, correct?
10   A.  No, I did not.
11   Q.  You just testified that you plan -- tell --
12 tell me what your testimony was.  How did I
13 mischaracterize it?
14   A.  I will testify and am testifying that
15 Gilead employees, from management down to the TSs,
16 ignored the prescriptions in the business conduct
17 manuals and that they operated their VEMLIDY and
18 Viread -- Viread and VEMLIDY speaker programs in a
19 way that was not consistent with the PhRMA code or
20 with the OIG's regulatory guidance -- compliance
21 guidance for pharmaceutical manufacturers.
22   Q.  Right, but that's not responsive to my
23 question.  My question is whether you plan to
24 testify that they did those things knowingly.
25   MR. SHAH:  Object to form.

Page 78

1    THE WITNESS: Through the actions of their
2  employees -- their employees knowingly, yes.
3  BY MR. LUSKEY:
4    Q.  And how do you define the term "knowingly"?
5    A.  Knowing that the business conduct manual
6  required them to do one thing, for example, report
7  noncompliance and then failing to do that.
8    Q.  And what about the term "willfully"?  Do
9  you plan to offer testimony that Gilead employees
10 willfully engaged in that misconduct?
11   A.  I don't know if they willfully did.  I -- I
12 didn't really consider their intent.
13   Q.  Well, you -- you just told us that you are
14 planning to testify that they did these things
15 knowingly.  Isn't that their intent?
16   A.  No.  I think knowingly and intentionally
17 are two different things.
18   Q.  How are they two different things?
19   A.  I just -- you can --
20   You know, you can know that you are
21 violating the business conduct manual, but you may
22 not have intent to do so or to do something wrong.
23   Q.  You can know that you are violating the
24 compliance policy, but you may not have the intent
25 to do that?

Page 79

1    A.  Or to do something wrong.
2    Q.  Right.
3    A.  People can be mistaken, you know.
4    Q.  Which Gilead employees do you intend to
5  testify acted knowingly in this way?
6    MR. SHAH:  Object to form.
7    THE WITNESS:  Okay.  Well, let's start with
8  Ms. Larson certainly knew the business conduct --
9  what the business conduct manual said and yet, at
10 times, she was involved in conduct that ran contrary
11 to what the clear mandate of the business conduct
12 manual.
13   MR. LUSKEY:  Okay.
14 BY MR. LUSKEY:
15   Q.  And so you -- and so you intend to offer
16 that testimony Ms. Larson knowingly violated the
17 business conduct manual, correct?
18   A.  Yeah.  She either ignored it or, you know,
19 knew what it said and did -- did the prohibited
20 behavior anyway.
21   MR. LUSKEY:  Okay.  Just give me one
22 second.  Sorry, there's a doorbell.  Let's go off
23 the record.
24   THE WITNESS:  Okay.
25   MR. LUSKEY:  I'm --

Page 80

1    MR. SHAH:  You need to go off, Randy?
2    MR. LUSKEY:  Yep.
3    THE VIDEOGRAPHER:  It is 11:59 a.m.
4  We are off the record.
5  (Short recess was taken from 11:59 a.m.
6  until 11:59 a.m.)
7    THE VIDEOGRAPHER:  Back on the record.
8  Time is 11:59 a.m.
9  BY MR. LUSKEY:
10   Q.  Okay.  And, Ms. Evans, so you described why
11 you believe Ms. Larson acted knowingly.  I just want
12 a list of the employees, that you intend to offer
13 testimony, acted knowingly to violate Gilead's
14 business conduct manual.
15   MR. SHAH:  Object to form.
16   THE WITNESS:  Okay.  So Ms. Larson would be
17 one of them.  I believe that her supervisors, Mr.
18 Schmal- -- Schmalzle, and I'm probably
19 mispronouncing his name, and other individuals who
20 were in the sales department knew, for example, that
21 attendees were supposed to be legitimate attendees,
22 were not supposed to be --
23 BY MR. LUSKEY:
24   Q.  Ms. Evans, I -- I just want --
25   A.  Yeah, am I --

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 8 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 81

1    Q.  Sorry, it's okay.  I just -- I just want a
2  list of the employees that you intend to offer acted
3  knowingly.  We can talk about the reasons for that
4  in a moment, but can you just provide me a list?
5    A.  Okay.  All right.
6       MR. SHAH:  Object to form.
7       You can answer.
8       THE WITNESS:  All right.  So, Graham
9  Warden, Leilani Larson, Tana -- and I -- forgive me,
10  I can't quite recall his name.
11      MR. LUSKEY:  No problem.
12      THE WITNESS:  Sarntinoranont -- Sarntin- --
13  Tana; Jeremy Schmalzle; Mr. Johnson -- D.J. Johnson;
14  Fufu He -- Dr. Fufu He, Dr. Calvin Pan.  I know
15  these were contractors, but nonetheless, Dr. Calvin
16  Pan, Dr. Fufu He, Danny Chu.  Ivan Tai.  Catherine
17  Chan.
18      Oh, Mr. Zlatar, Ilija Zlatar, I believe.
19  Susan Lin.  And then, of course, Ms. Groome --
20  Kimberly Groome.  And Mr. Purcell.  That's all I can
21  recall at this point.
22  BY MR. LUSKEY:
23    Q.  Okay.  And just so we're clear, your
24  testimony is that you plan to offer expert opinions
25  in this case not just that those employees violated

Page 82

1  the business conduct manual, but that they did so
2  knowingly, correct?
3    A.  In some cases.  I don't know that I
4  could -- I'd have to go back and think about
5  circumstances with respect to each one of them, but
6  yes.
7    Q.  Okay.  And do you plan to offer an expert
8  opinion at trial in this case that Gilead used
9  speaker selection to induce or reward prescriptions?
10    A.  Yes.
11    Q.  For instance, on page 32 to 33 of your
12  expert report -- I think you've got that in front of
13  you, the very last line of page 33, you note:  "Like
14  ad board selection, speaker selection was used as a
15  way of rewarding physicians for past prescriptions
16  or inducing them to write future prescriptions of
17  Viread and VEMLIDY," correct?
18    A.  Right.
19    Q.  That's an opinion you plan to offer in this
20  case, right?
21    A.  That's my opinion, yes.
22    Q.  And "induce" and "reward," the language you
23  use in that sentence, those are the words used by
24  the relevant statute in this case, correct?
25      MR. SHAH:  Object to form.

Page 83

1       THE WITNESS:  I don't recall what the
2  statute -- I -- you know, I don't recall, really,
3  whether it's the statute or whether it's the
4  guidance.  I can't -- I can't recall.
5  BY MR. LUSKEY:
6    Q.  Wait.  As you sit here today, you don't
7  recall whether the Anti-Kickback Statute talks about
8  inducement or reward?
9    A.  I think it does, yes.
10      MR. SHAH:  Object to form.
11      THE WITNESS:  But I can't recall.
12  BY MR. LUSKEY:
13    Q.  Okay.  And -- and you plan to offer an
14  expert opinion that Gilead did, in fact, induce and
15  reward prescriptions, correct?
16    A.  Yes, or influence prescriptions, yes.
17    Q.  You just said "influence."  Your report
18  says "induce"; is that -- is that correct?
19    A.  I guess, yeah.
20    Q.  So you plan to --
21    A.  I'm sorry, what was the question again?
22  I'm -- I'm confused.
23    Q.  Oh, my -- my last question was just that
24  your report says inducing them to write
25  prescriptions, correct?

Page 84

1    A.  Right, uh-hm.
2    Q.  So you plan to inform the jury that based
3  on your review of some of the evidence in this case,
4  you have concluded, in your expert opinion, that
5  Gilead did, in fact, use speaker selection to induce
6  or reward prescriptions, right?
7    A.  I -- I'm having a difficult time answering
8  this question because really what I was looking at
9  was the compliance program.  So, if you go back and
10  you -- and you say, did the compliance program
11  prevent the risk that the following individuals used
12  the lure of speaker payments to induce prescription,
13  the answer would be no, it did not reduce the risk.
14  How do you know that, would be the next question,
15  and I would say based on the information and the
16  documents and the testimony that I reviewed, the
17  following people -- and -- and those are the people
18  that I just named for you -- were involved in
19  activities that were in contravention of the
20  business conduct manual did not deter the -- the
21  noncompliant behavior.
22      So, I -- I think you have to go back to the
23  business conduct manual and the business conduct
24  department.
25    Q.  That's all well and good, and I understand

Volume I
Virginia B. Evans

United States of America vs.
Gilead Sciences, Inc.

Page 133

1  qualified as a compliance expert by a court of law?
2  A.  No.
3  Q.  Have you ever testified at trial as a
4  compliance expert?
5  A.  No.
6  Q.  Have you ever served as a compliance
7  officer at a pharmaceutical company?
8  A.  No.
9  Q.  Have you ever worked at a pharmaceutical
10 company?
11  A.  No, except I have served as a compliance
12 expert for three years for the Bayer domestic --
13 domestic board.  That was part of my engagement,
14 yeah.
15  Q.  Okay.  And in this case, you are charging
16 $400 per hour, correct?
17  A.  Yes, sir.
18  Q.  Approximately how much will you bill for
19 your work as of today?
20  A.  I don't know.  I have not done the billing.
21  Q.  Could you ballpark the number for me?
22  A.  I can't.  I'm sorry.
23  Q.  Okay.  Were you compensated for your work
24 on the other litigation cases we just discussed?
25  A.  Yes.

Page 134

1  Q.  Approximately how much did you make in the
2  Novartis case?
3  A.  Oh, I can't recall.  I think it was close
4  to $100,000 in that case.
5  Q.  What about in Janssen?
6  A.  I really can't recall on Janssen.
7  Q.  What about in Teva?
8  A.  I think Teva was close to -- excuse me, 30,
9  35,000, something like that.
10  Q.  And you don't have any contingency fee in
11 these cases, correct?
12  A.  No, sir.
13  Q.  How much -- what percentage of your annual
14 income comes from your work as a expert in
15 litigation matters?
16  A.  Well, last year, I think I made 14,000 and
17 I don't know this year what it will be, but...
18  Q.  So my question was what -- approximately
19 what percentage of your annual income is from your
20 work as an expert?
21  A.  Oh, jeez.  I don't know the answer to that.
22 I can tell you what I made at Thomson Reuters and we
23 can figure it out from there, but...
24  Q.  Sure.
25  A.  It's a -- I would say maybe -- last year,

Page 135

1  it was 10 percent.
2  Q.  Understood.
3  Okay.  I want to talk about the -- the risk
4  assessment and internal audit report that you
5  mentioned from 2014 that you had not been provided
6  in advance of rendering your expert opinions in this
7  case on May 3rd and May 26th.  You've now had a
8  chance to review the 2014 internal audit report,
9  correct?
10  A.  Yes, sir.  And -- and I have to -- I want
11 to correct the record.  I apparently did have access
12 to those two -- I guess they -- they look like
13 PowerPoints earlier, and I mistakenly said that I
14 did not, and I think I was confusing it with the
15 NARCR (sic), or whatever those are, the compliance
16 committee, right.
17  Q.  Oh, so you had access to the 2014
18 internal audit report, but you had not reviewed it
19 at the time of submitting your expert opinions in
20 this case, correct?
21  MR. SHAH:  Object -- object to form.
22  THE WITNESS:  I --
23  MR. LUSKEY:  Sorry?
24  THE WITNESS:  I'm not -- I'm not sure when
25 I saw them -- first saw them, but I did not remark

Page 136

1  on them until -- yeah.  I -- I'm sorry, I just can't
2  recall when I first saw them.
3  BY MR. LUSKEY:
4  Q.  Well, in your expert rebuttal report that
5  you filed six days ago, you note that this document
6  was "apparently withheld on the basis of privilege,"
7  correct?
8  A.  That's what I understood.
9  Q.  That was inaccurate, correct?
10  A.  I think so, yes.
11  Q.  So you had not reviewed the 2014 internal
12 audit report at the time you submitted your rebuttal
13 report on May 26th, correct?
14  A.  I think that's right, yes.
15  Q.  Okay.
16  A.  I'm not sure, but -- I just can't recall.
17 I've looked at so many documents, so I just can't --
18  Q.  Well, you --
19  A.  -- so I just can't recall.
20  Q.  You think you may have reviewed it, even
21 though you stated in your report that it was
22 withheld on the basis of privilege?
23  A.  No.  I can't -- I'm -- I'm sorry, I'm
24 confused and I'd -- I'd have to go back and see what
25 time -- when I first looked at it, when it came into

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 10 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 137

1  my cache of documents that were in the website, and
2  I just really can't recall that.
3     Q.  But your testimony, under oath today, is
4  that you may have looked at the 2014 internal audit
5  document prior to submitting your rebuttal report,
6  even though you stated in that report that it was
7  withheld on the basis of privilege?
8     A.  I don't think I did because I was under the
9  assumption that we -- that we didn't have them or we
10 had some problem getting them, or whatever.
11    Q.  Okay.
12    A.  I really can't recall.
13    Q.  Okay.  Understood.
14        And so when you wrote in your rebuttal
15 report that no conclusions could be fairly reached
16 about these auditing and monitoring activities, at
17 that time, you had not yet reviewed this document,
18 correct?
19    A.  That's -- I believe that's correct, yes.
20    Q.  Okay.  And this document -- and the
21 documents relating to the 2014 internal audit
22 report, they were cited in Kevin McAnaney's opening
23 report on May 3rd, correct?
24    A.  Right.
25    Q.  Did you ask counsel to provide you those

Page 138

1  materials?
2     A.  I think I did.  I can't recall.  I think I
3  went down and tried to find them myself based on
4  Kevin's reference using the Bates-number or GP
5  number, but it was really hard to find them 'cause
6  it wasn't a single -- it's hard to explain, but it
7  wasn't a single cache of documents.  There were,
8  like, tranches that came, so I had to go backwards
9  through time and try and find them.
10    Q.  Okay.  Let's take a look at these documents
11 and flip through them.
12        MR. LUSKEY:  So this will be introduced as
13 the next exhibit in order.  It's Tab 292.  And for
14 the record, this exhibit is Bates-Labeled Gilead
15 Purcell 340625 through 340637.  It is titled
16 "Speaker Program Review, Internal Audit Report
17 October 2014."  We'll pull that up on your screen.
18 This will be Exhibit 9.
19        (Exhibit 9 was marked for identification.)
20        MR. LUSKEY:  Spencer, these are taking a
21 while to load.
22        THE VIDEOGRAPHER:  I'm having a computer
23 issue again.
24        MR. LUSKEY:  Let's go off the record.  Can
25 we go off the record?

Page 139

1        THE VIDEOGRAPHER:  Time is 2:00 p.m.
2        We are off the record.
3        (Short recess was taken from 2:00 p.m.
4        until 2:01 p.m.)
5        THE VIDEOGRAPHER:  Okay.  We're back on the
6  record and the time is 2:01 p.m.
7  BY MR. LUSKEY:
8     Q.  I -- Ms. Evans, Exhibit 9 is the 2- --
9  October 2014 audit report that you reviewed sometime
10 for the first -- or, excuse me, for the first time
11 sometime in the last six days, correct?
12        MR. SHAH:  Object to form.
13        THE WITNESS:  Yes, it is.
14        MR. LUSKEY:  What -- what was the -- what's
15 the objection?  I want to correct that question,
16 Jim.
17        MR. SHAH:  I just was objecting to form.  I
18 wasn't certain it accurately stated her prior
19 testimony, Randy, that's all.
20        MR. LUSKEY:  Okay.  All right.  I think we
21 have got the answer there.  All right.
22 BY MR. LUSKEY:
23    Q.  So if you flip to page 2 of this document,
24 you'll see that -- we'll blow up the screen for you
25 a little bit, the objective of the audit "was to

Page 140

1  evaluate the controls in place to ensure that
2  documented processes exist for the selection,
3  classification, and approval of speakers" and that
4  processes are in place to ensure proper utilization
5  and payments in line with established fair market
6  values.
7        Correct?
8     A.  Yes.
9     Q.  Any concerns about the scope of this
10 internal audit?
11    A.  No.
12        MR. SHAH:  Object to form.
13        MR. LUSKEY:  All right.
14 BY MR. LUSKEY:
15    Q.  And the audit was across the entire United
16 States; is that right?
17    A.  I don't know the answer to that.  Oh, I
18 guess, yes.  I see.
19    Q.  Okay.  No problem.
20        And the scope of the audit included all
21 U.S. speaker programs during the period from
22 July 1st, 2013, through June 30th, 2014, so
23 basically a full year's worth of speaker programs,
24 correct?
25    A.  Yes, sir.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 11 of 32

United States of America vs.
Gilead Sciences, Inc.

1    Q.  Is that a decent sample size for an
2  internal audit?
3        MR. SHAH:  Object to form.
4        THE WITNESS:  Would that be a good sample
5  size, is what you're asking?
6  BY MR. LUSKEY:
7    Q.  That's right.  That's what I meant to ask.
8    A.  Certainly.
9    Q.  And then, continuing down on that page
10  under "Conclusions," it notes:  "Overall, speaker
11  programs are generally conducted within the
12  framework outlined by the BCM."
13        Did I read that correctly?
14    A.  Yes.
15    Q.  And then, it notes the first issue there,
16  under "Conclusions," that "With regard to the
17  accuracy of the speaker program, payment information
18  provided by a third-party provider, AHM, and
19  reflected in the CompleteSpend system, a number of
20  instances were noted where confirmed and unconfirmed
21  speakers appeared to be paid to speak at the
22  program."  It looks like they identified this is an
23  a system logic area; is that correct?
24    A.  Yes.
25    Q.  This finding relates to a -- a data

1  integrity issue; would you agree?
2    A.  Seems to, yes.
3    Q.  And that's, you know, one of the things
4  that you like to see in audits, is part of the OIG
5  compliance guidance to look for data integrity
6  issues, correct?
7    A.  That would be one thing, yes, sir.
8    Q.  And then continuing on, it notes:
9  "Additionally, HCPs were found to attend some topic
10  programs multiple times within a relatively short
11  period of time."
12        So this is a repeat-attendee finding,
13  correct?
14    A.  Yes.
15    Q.  Your understanding, based on review of this
16  document, is that Gilead conducted an audit of the
17  repeated-attendee issue as early as 2014?
18    A.  Yes.
19    Q.  And then, finally, another finding there
20  relating to the speaker program nomination process;
21  do you see that?
22    A.  Yes.
23    Q.  All right.  And then if we scroll to page 3
24  of this document, and look at finding two.  Here, it
25  notes that there are "Instances noted where health

1  care professionals (HCPs) attended multiple events
2  that featured the same educational topic," correct?
3    A.  That's right.
4    Q.  And it says -- a second.  It says there, in
5  that first main paragraph, "While the business
6  conduct manual does not provide guidance related to
7  the frequency of attendance at same topic meetings,
8  a review indicated that 117 HCPs appeared to attend
9  on multiple events that featured the same
10  educational topic," correct?
11    A.  Yes.
12    Q.  And then continuing on, it notes, in that
13  same paragraph, "Our analysis indicated that the
14  frequency of attendance at the same topic ranged
15  from three to 15 times," correct?
16    A.  Yes.
17    Q.  That was across all therapeutic areas?
18    A.  Apparently so, yes.
19    Q.  And it looks like, from that chart, you'll
20  see down below there, that the vast majority of
21  those, 61 percent, were HCPs that had attended three
22  programs on the same topic, correct?
23    A.  Yes.
24    Q.  And then the recommendation is "We
25  recommend that business conduct develop guidance

1  related to appropriate meeting attendee" -- excuse
2  me, "attendance frequency for same topic meetings,"
3  correct?
4    A.  That's -- that was the recommendation.  If
5  you could go a little bit -- scroll up a little bit
6  so I can see the req.
7    Q.  Of course.
8    A.  Yeah, there you go.  Uh-hm.
9    Q.  And then the next column is the "Management
10  Response."  Is that typical in a audit document, to
11  have a recommendation and a management response?
12    A.  Yes, I've seen those in internal audit
13  documents before.
14    Q.  And it states that the business conduct
15  manual is updated each year and that Gilead will
16  continue to monitor this frequency issue during 2015
17  and will make a recommendation on a limit, and then
18  it also indicates that they will do some
19  benchmarking within the industry, correct?
20    A.  That's what it says, yes.
21    Q.  And before we address whether Gilead
22  actually executed on this, which we'll look at in a
23  minute, would you consider this to be a reasonable
24  remediation plan?
25    A.  A reasonable what, sir?

Volume I
Virginia B. Evans
Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 12 of 32
United States of America vs.
Gilead Sciences, Inc.

1    Q.  Remediation plan.

2    A.  I wouldn't characterize it as effective,
3  going back to my report.  I mean, it had some good
4  ideas, but, yeah, I mean, I wouldn't -- I wouldn't
5  characterize it as a remediation plan or effective
6  correction action -- corrective action plan, no.

7    Q.  What was ineffective about this corrective
8  action plan from your prospective?

9    A.  Well, for one thing, it -- nothing was done
10  for at least a year.  In 2016, they finally changed
11  the business conduct manual to address the repeat
12  attendance issue.  Prior to that time, they didn't
13  do anything, despite the fact that in -- in 2014, it
14  was pretty obvious that there were -- there was a
15  big repeated attendance problem.

16    In fact, when I went back and I looked at
17  Dr. He's testimony and the number of times in 2014
18  and 2015 he attended or spoke on the same topic, it
19  was -- it was really pretty amazing.  In 2014, he
20  went to a conference and he went to three more on
21  the same topic in January alone.  In February, he
22  went to another one.  So, you know, not even a month
23  later, same -- same program, same doctor, and he
24  was -- you know, this is when he was -- you know,
25  this is at a time when Gilead knew that there was a

1  repeat attendance problem.  I don't understand why
2  they didn't just fix it.

3    Q.  And we'll look at the fix in just a moment.
4  But not only did Gilead know, but they actually
5  caught that anecdote you just described with Dr. He,
6  right?  He would have been captured in this chart
7  right here that reflects repeat attendees, correct?

8    A.  Not in 2015.

9    Q.  No, you -- you just gave us an example from
10  2013 into 2014, I thought you said?

11    A.  No, I didn't.  In November of 2014, he went
12  to a speaker program and then he had three in
13  January of 2015 alone.  And then he started speaking
14  in March of 2015, so these earlier ones were
15  attendee issues.  He started speaking in March of
16  2015, and the very first speaker program he hosted
17  had an open bar.

18    So I don't consider this to be a
19  corrective -- an effective corrective action plan at
20  all.  Basically, they're saying is -- what they're
21  saying is let's put something in the business
22  conduct manual and that doesn't happen until 2016,
23  so --

24    Q.  And -- and they note here that they will
25  consider implementation in Q4 2015.  You did not

1  review any documents that suggest that Gilead made
2  those policy changes relating to repeat attendees in
3  2015, correct?

4    A.  I didn't see anything that indicated that
5  they made those changes until 2016.

6    Q.  Great.  We'll look at that in a moment.

7    And so your testimony is that this action
8  plan that required -- that recommended monitoring,
9  gathering more data, benchmarking an analysis before
10  making a policy change, was ineffective, correct?

11    MR. SHAH:  Object to form.

12    THE WITNESS:  I'm sorry?

13    MR. LUSKEY:  Okay.  He said object to form.
14  You can answer.

15    THE WITNESS:  Yes, I think it was
16  ineffective.

17  BY MR. LUSKEY:

18    Q.  Okay.  And then let's take a look at a few
19  more documents relating to this audit.  We will
20  introduce as Exhibit 9, Tab 269.

21    THE STENOGRAPHER:  I believe it's
22  Exhibit 10.

23    MR. LUSKEY:  Sorry about that.  Exhibit 10,
24  thank you.

25    (Exhibit 10 was marked for identification.)

1  BY MR. LUSKEY:

2    Q.  For the record, Exhibit 10 is a PowerPoint
3  presentation labeled "Speaker Program Working Group,
4  June 22nd, 2015."

5    Ms. Evans, do you see that document up on
6  your screen, Exhibit 10?

7    A.  I do.

8    Q.  This document is not listed on your
9  materials-considered list.  Is this the first time
10  you've seen it?

11    A.  Hmm.  I don't recall.

12    Q.  As you sit here today, you don't recall
13  reviewing the Speaker Program Working Group
14  presentation from June 22nd, 2015?

15    A.  I don't recall seeing it.  I -- I really --
16  I think I -- I just can't recall.  I'm sorry.  I'd
17  be speculating, so --

18    Q.  If you had reviewed and considered this
19  document, would you have included it in Appendix B?

20    A.  I don't know.  Can we scroll through the
21  document?  And maybe --

22    Q.  Absolutely.

23    MR. LUSKEY:  Yeah, let -- let's go off the
24  record and let Ms. Evans scroll through it.  It's a
25  long -- a lengthy document.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 13 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 149

1    THE VIDEOGRAPHER:  Okay.  The time is
2  2:13 p.m.
3    We are off the record.
4    (Short recess was taken from 2:13 p.m.
5    until 2:14 p.m.)
6    THE VIDEOGRAPHER:  We are back on the
7  record and the time is 2:14 p.m.
8  BY MR. LUSKEY:
9    Q.  Ms. Evans, is this your first time seeing
10  this document?
11    A.  I can't recall seeing it and it -- running
12  through it, I -- you know, I may have seen it and it
13  just didn't -- you know, I can't recall.
14    MR. LUSKEY:  Okay.  And on the -- sorry,
15  one -- let me give you some context for this
16  document.  I'm going to introduce as Exhibit 11, Tab
17  227.
18    (Exhibit 11 was marked for identification.)
19  BY MR. LUSKEY:
20    Q.  This is just a two-page e-mail, so you can
21  flip through it briefly.
22    A.  Uh-hm.
23    Q.  And for the record, Exhibit 11 is a
24  two-page e-mail Bates-Labeled Gilead Purcell 177920
25  through 921.

Page 150

1    Ms. Evans, I -- I don't believe this
2  document is listed on your materials considered.  Is
3  this your first time seeing it?
4    A.  I think it is, but I'm -- I -- I'm not
5  sure, so...
6    Q.  Do you -- do you know who David Ralston is?
7  You'll see that the first e-mail in the thread is
8  sent by David Ralston?
9    A.  Chief compliance officer?
10    Q.  No, good guess.  No.  No.  He's -- I'll
11  represent to you that he was, at this time, the head
12  of Gilead's business conduct group.  Does that ring
13  a bell?
14    A.  No.
15    MR. SHAH:  Object to form.
16    MR. LUSKEY:  Object to form?  Sorry.
17  BY MR. LUSKEY:
18    Q.  Does that sound familiar?
19    A.  No, it doesn't, really.
20    Q.  Okay.  And in this e-mail dated
21  October 13th, 2015, Mr. Ralston writes, "Team, in
22  early spring, business conduct shared an overview of
23  recent speaker program enforcement issues and
24  Gilead's options for risk minimization with the
25  North America Compliance Review Committee (NACRC).

Page 151

1  Leadership agreed to form a 'Speaker Program Working
2  Group' (SPWG), consisting of key leads from OLP
3  marketing, OLP operations, and business conduct to
4  assess and make recommendation of -- on six key
5  speaker program process and policy improvements."
6    Were you aware of that effort?
7    A.  I have some recollection reading about it,
8  but nothing specific.
9    Q.  You don't recall being provided any
10  documents relating to the 2015 Speaker Program
11  Working Group that you considered prior to
12  submitting your expert opinions in this matter?
13    A.  No.  I didn't say that.  I -- I can't
14  recall seeing it.  I don't know if it was in the
15  group of documents that I reviewed or not.
16    Q.  Okay.
17    A.  I -- yeah, I can't recall.
18    Q.  Okay.  And -- and this mentions the NACRC,
19  that's that main compliance committee we -- you
20  testified about earlier, correct?
21    A.  Right.
22    Q.  All right.  That includes senior
23  leadership; is that fair?
24    A.  Yes.
25    Q.  It includes the head of the commercial

Page 152

1  business units, right?
2    A.  Yes.
3    Q.  It includes business conduct?
4    A.  I guess, yes, uh-hm.
5    Q.  You've seen some of those agendas, right?
6    A.  Right.
7    Q.  Okay.  And the e-mail continues, it says:
8  "Below is a summary of these improvements and the
9  finalized outcomes recently approved by the NACRC
10  and the September 11th meeting."
11    The first one of those is a "BPOA process
12  to create uniform needs assessment regarding the
13  number of speaker programs and paid speakers."
14    Were you aware of that process improvement
15  that was put in place in 2015?
16    A.  I would not call that a process improvement
17  that was put in place.  That may be what it -- it
18  says, but I saw lots of information and then data
19  and documents that -- as I said in my report, that
20  indicate that basically the therapeutic specialists
21  were determining when there was a need in their
22  territory for a speaker program.
23    Q.  I understand.
24    A.  So I don't think that there was a uniform
25  needs assessment process that was put in place.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 14 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 153

1    Q.  So it -- I understand your testimony that
2  it wasn't effectively followed.  We will talk about
3  that in a moment, but my question was:  This e-mail,
4  sent on October 2015 by the head of the business
5  conduct unit, describes process improvements that
6  were approved by the NACRC.
7      Were you aware of this first such process
8  improvement?
9    A.  And, again, I'm not sure that I would call
10  it a process improvement because I did not see that
11  this -- I did not see evidence in all the documents
12  and information that I looked at suggested that this
13  actually took place.
14    Q.  Okay.  I -- I -- I'm just using the term in
15  the e-mail, "process improvement."  I understand
16  your testimony you don't believe it was effectively
17  enforced.  My question was:  Were you aware that the
18  NACRC approved this policy change?
19    A.  No.  I received -- I didn't have any
20  minutes from the NACRC, so I don't know what they
21  did.
22    Q.  And -- well -- well, you certainly know now
23  'cause you've got this e-mail here that says the
24  NACRC approved it, right?
25    A.  That's what it says, yes.

Page 154

1    Q.  Okay.  And also the next process
2  improvement that's described is a standardized
3  Gilead speaker nomination process across TAs,
4  including all brands moving to an online process
5  with universal speaker portal.
6      Were you aware of that policy change that
7  was implemented in 2015?
8    A.  I remember that there was a discussion
9  about a universal speaker portal.  That's all I can
10  remember about that.
11    Q.  Okay.  You were not aware of a -- this
12  policy recommendation coming from the Speaker
13  Program Working Group that was assembled in 2015?
14    A.  No.  No, I was not.
15    Q.  Okay.  And then if you flip to the next
16  page, under No. 2, "Policy Improvements."  The first
17  one here is a "Yearly attendance cap for attending
18  the same speaker program topic."  "Implementation of
19  a cap of three programs on the same topic per
20  calendar year" and "Ongoing monitoring will advise
21  tracking to caps."
22      Were you aware of that policy improvement
23  being a -- improved and communicated to the sales
24  force in October 2015?
25    A.  I do not know that it was communicated to

Page 155

1  the sales force, other than this e-mail.  I do know
2  that the repeat attendance issue continued well into
3  2016, '17; it was a continuing problem.
4    Q.  I understand, and -- and we will talk about
5  that and we'll get there in a moment.
6      My question to you is:  A moment ago, you
7  testified nothing was done about repeat attendees in
8  2015.  Does this -- seeing this e-mail change your
9  opinion?
10    A.  No, it does not.
11    Q.  Okay.  So you still believe that nothing
12  was done with respect to the repeat attendee issue
13  that was analyzed in the 2014 audit, even after
14  seeing this October 2015 e-mail?
15    A.  Yes, and I can explain why.
16    Q.  Sure.
17    A.  My review of the documents indicated that
18  throughout 2015 and 2016, not only Dr. Hee, but
19  other documents.  Dr. Lee was one of them, had
20  repeat attendance at many, many, many of their
21  speaker programs, and the same names kept cropping
22  up.  So, I would start to look for, for example, Ray
23  Chan and Lily Chan, they -- they went to at least
24  three speaker programs in 2015, again in 2016, and
25  then there was another doctor whose name came up

Page 156

1  frequently and that was -- I believe it was Matthew
2  Mo and his wife, I think her name was Christine Mo,
3  and they -- they were repeat attendees after the
4  2014 audit and after 2015 at programs that were put
5  on by the sales representative Susan Lin.  So, yeah,
6  I started to look for this 'cause I was hoping,
7  frankly, to see some real corrective action and --
8  and it just didn't seem like what Gilead was doing
9  was having any effect.
10    Q.  How does citing those two anecdotal
11  examples prove that what Gilead was doing had no
12  effect?
13    A.  Because it was not just those two anecdotal
14  exam-- -- examples, Mr. Luskey.  There were lots and
15  lots and lots of examples throughout the documents,
16  and I frankly don't think that these policies that
17  were implemented -- excuse me, the policies that
18  were put into place on paper were implemented,
19  certainly not in 2015, and -- and moving into 2016,
20  2017, they were still having problems with repeat
21  attendance.
22    Q.  Still having problems doesn't indicate that
23  there wasn't a policy change, right?  The standard
24  for --
25    A.  Well --

Volume I
Virginia B. Evans

United States of America vs.
Gilead Sciences, Inc.

Page 157

1    Q.  -- an effective compliance program is not
2  perfection, is it?
3    A.  No, and -- and, in fact, it is not
4  perfection, but what a compliance program that is
5  effective should be doing is taking the information
6  and data that it has and using that data to
7  continuously improve so that issues that create risk
8  are then ameliorated by things like, hey, talking to
9  the speaker hosts themselves.  You know, you've got
10 situations where these same physicians are coming to
11 the same meetings where this physician has a myriad
12 of people coming to his speaker programs that he
13 doesn't even know if they work for him or who they
14 are or -- you know, it -- it -- there just didn't
15 seem to be any communication on the ground, here's
16 the policy, abide by the policy.  It doesn't take a
17 year to write this.
18    Q.  You testified --
19    A.  2014 to 2016.  It didn't take a year to
20 write a policy that said you could only attend three
21 times.  I mean, it just -- it really made it look as
22 if business compliance didn't really want to
23 enforce -- rigorously enforce the policies that they
24 were putting into place.
25    Q.  You testified earlier that there were no

Page 158

1  policy improvements with respect to repeat attendees
2  in 2015.  That is incorrect, right?
3    MR. SHAH:  Object to form.
4    You can answer, Virginia.
5    THE WITNESS:  I would rely on my report and
6  I would -- I would state that I do not think that
7  there were -- that with respect to repeat attendees,
8  this policy change that you're talking about in a
9  memo that did not become part of the business
10 conduct manual in 2015, had much, if any, effect.
11 It was not effective.
12 BY MR. LUSKEY:
13    Q.  You said you would rely on your report, but
14 you wrote your report before you saw this document,
15 right?
16    A.  Well, my report -- this document has not
17 changed my mind, sir.
18    Q.  Understood.  All right.  And so continuing
19 on, let's take a look at what the Speaker Program
20 Working Group actually did.  And I know you haven't
21 seen this document until today, but we're going to
22 flip through it.  This is exhibit -- we're going to
23 go back to Exhibit 10.
24    If we flip to Slide 13 to start, this is
25 where they begin to discuss policy improvements and

Page 159

1  mention the yearly attendance cap for attending the
2  same speaker program topic, correct?
3    A.  Yes.
4    Q.  Okay.  So the audit identified this as an
5  issue in October 2014, and then in June 2015, they
6  began to -- there's a discussion of policy
7  improvements to fix that compliance gap, correct?
8    A.  I guess there was a discussion at the
9  working group.
10    Q.  Okay.
11    A.  I don't know.  I don't have minutes from
12 the working group, so it's hard for me to say.
13    Q.  And then on Slide 14, there's a list of
14 policy rec-- or a list of recommendations here,
15 including implementing an initial cap of four
16 programs on the same topic per calendar year.
17    Ongoing monitoring, including a "clear plan
18 for accurate by BC needed, preemptive versus
19 post-hoc approach being considered."
20    Do you see that?
21    A.  Yes, I don't know what that means.  "Clear
22 plan for accurate by BC," hmm, okay.  Don't know.  I
23 see that, yes.
24    Q.  You see it, okay.  And then Slide 15
25 discusses the rational for these policy changes.  It

Page 160

1  talks about "Observational data suggests that
2  without speaker program cap, Gilead norms are well
3  within control."
4    Do you see that?
5    A.  Yes.  I'm not sure what that refers to.
6    Q.  Okay.
7    A.  Does that refer to the number of times a
8  speaker can attend, the number of times anyone can
9  attend, or speaker program caps on payment?  I don't
10 know.
11    Q.  Understood.
12    And you'll -- you'll recall that in the
13 audit, across all programs, there were 117 attendees
14 who had -- who had attended three programs on the
15 same topic, correct?
16    A.  In a year, yes.
17    Q.  In a year, right.  And only 46 were at or
18 over four programs on the same topic across the
19 company, correct?
20    A.  Right.
21    Q.  Okay.  And let's see here.  And then it
22 also notes that they considered some benchmarking
23 data; do you see that?
24    A.  Yes.
25    Q.  The final bullet point.  And they noted

Case 2:17-cv-03523-MAK   Document 234-2   Filed 06/14/21   Page 16 of 32

Volume I                                            United States of America vs.
Virginia B. Evans                                   Gilead Sciences, Inc.

Page 161

1  that only 36 percent of companies, at this time,
2  were limiting repeat attendance, correct?
3     A.  Right.  I see that's what they say.
4     Q.  Okay.  And then Slide 16 through 17 is the
5  rational -- oh, excuse me, Slide 16 through 17 is a
6  discussion of a policy improvement regarding
7  guidelines for how different a speaker program must
8  be to be considered a different speaker program,
9  right?
10    A.  I guess that's what it says.  I have no
11 idea what they're talking about there, really.
12    Q.  Okay.  One second.  All right.  We can --
13 we can put that down.
14       And then you mentioned that in 2016, Gilead
15 actually amended the business conduct manual to
16 implement this policy change around repeat
17 attendees, correct?
18    A.  I believe that's correct, yes.
19    Q.  So, there was an audit in 2014, then in
20 June of 2015, there's a Speaker Program Working
21 Group, then October 13th, 2015, David Ralston, the
22 head of business conduct, sends out the e-mail
23 listing the process improvements and the policy
24 changes, and then in 2016, the business conduct
25 manual was revised; is that correct?

Page 162

1     A.  That's my understanding, yes.
2     Q.  Okay.  But your testimony today, as
3  consistent -- strike that.
4        But you still believe, as reflected in your
5  expert report, that Gilead conducted no meaningful
6  risk assessment activities that drove policy
7  development, correct?
8     A.  That's correct.
9        MR. LUSKEY:  Okay.  And then one more
10 document to review.  This is -- this will be
11 Exhibit 12, which is Tab 218.
12       (Exhibit 12 was marked for identification.)
13 BY MR. LUSKEY:
14    Q.  For the record, Exhibit 12 is Gilead
15 Purcell 116569 through 6570.
16       Ms. Evans, you can flip through this one.
17 It's just a -- basically a one-pager.
18       Have you seen this one before?
19    A.  I have.  Uh-hm.
20    Q.  All right.  And so this is an e-mail from
21 Jim Meyers in 2017, which was about a year and a
22 half after those initial repeat attendee rules
23 were -- were rolled out, right?
24    A.  Right.  Uh-hm.
25    Q.  Do you know who Jim Meyers is?

Page 163

1     A.  No.
2     Q.  Okay.
3     A.  I do not.
4     Q.  All right.  He was the head of Gilead's
5  U.S. commercial team at this time, I'll represent to
6  you.  And he mentions the new rules from the
7  beginning of 2016.
8        You see that there?
9     A.  I --
10    Q.  And then -- and then he says, "Now that we
11 have a full year of experience and data related to
12 how those rules have been applied, we are making
13 some refinements to those rules going forward,"
14 correct?
15    A.  That's what it says, yes.
16    Q.  Fair to say, Gilead continued to analyze
17 the risks and data associated with repeat attendees,
18 even after rolling out new policies in 2016?
19    A.  Well, yes, and the reason they did that is
20 because the repeat attendee problem continued.
21    Q.  Absolutely, and they continued to monitor
22 it and then implement new policy changes, correct?
23    A.  Well, the policies that they implemented in
24 2016 and -- and -- were not doing anything, were not
25 being effective, so I guess they came up with a new

Page 164

1  idea, but my contention, as is -- I've stated in my
2  report, is that the reason that the policies weren't
3  affected is because they weren't being enforced.
4     Q.  You -- you -- you continue to say that the
5  policies weren't doing anything, but you haven't --
6  you haven't reviewed any of the data showing
7  improvements in the repeat attendee issue, have you?
8     A.  I have -- I tried to find improvements in
9  areas throughout my review of the compliance
10 program.  I did not see improvements with respect to
11 repeated attendees.  For example, Dr. Danny Chu had,
12 I think, 79 speaking speaker programs during the
13 review period and he had the same person go to 29 of
14 them.  So I just -- I have a difficult time
15 understanding how you can think that repeated --
16 repeated attendee problem was fixed in 2016 or 2017.
17    Q.  I don't know how -- how the Danny Chu
18 anecdote that you just shared really gets at the
19 question I asked.  That's 29 programs from 2013 to
20 2019 that you just referenced?
21    A.  79 and he had the same person going to at
22 least 29 of them.
23    Q.  Over the six-year period?
24    A.  Yeah.
25    Q.  Was that person a -- did he go to more than

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 17 of 32

Volume I                                                     United States of America vs.
Virginia B. Evans                                           Gilead Sciences, Inc.

Page 165

1   three programs in 2016?
2       A.   I believe he did, yes.
3       Q.   You -- you can testify to that, under oath,
4   you know that for sure?
5       A.   I'd have to go back and look at it, but
6   I -- I believe that he did.
7       Q.   What about 2017?
8       A.   I don't know about 2017.
9       Q.   Okay.  But this is your example for how the
10  new rules in 2016 were not doing anything; is that
11  correct?
12      A.   2015 and 2016.
13          MR. SHAH:  Object to form.
14          MR. LUSKEY:  Okay.
15  BY MR. LUSKEY:
16      Q.   But this is the type of activity you want
17  to see from an effective compliance program, right,
18  monitoring the data and making new policy
19  announcements; isn't that fair?
20          MR. SHAH:  Object to form.
21          THE WITNESS:  And -- yes, sir, and I would
22  like to see that this is being rolled out to the
23  therapeutic specialists, who would then be educated
24  on the reason behind this particular rule, and then
25  after they've been educated, you would want to go

Page 166

1   back and see that the rule is being fairly
2   implemented and that, you know, from that date
3   forward, from the day that you explained the reason
4   for the repeat attendee rule, that particular
5   therapeutic specialist made sure that it is speaker
6   programs, the ones that he was hosting, there
7   weren't repeat attendees.
8          MR. LUSKEY:  Uh-hm.
9          THE WITNESS:  And I didn't see that
10  happening.
11  BY MR. LUSKEY:
12      Q.   And it's clear that, in 2017, Gilead --
13  Gilead made the repeat attendee rules even tighter,
14  correct?
15      A.   On paper, it made the repeat attendee rules
16  tighter.
17      Q.   Do you have any evidence to suggest that
18  Gilead did not actually roll these rules out,
19  communicate them to the sales force?
20      A.   I actually -- I read an interesting -- an
21  interesting part of Mr. Purcell's dep- -- deposition
22  where he stated that Ms. Larson changed the rules so
23  that a single speaker topic could be broken up into
24  several speaker topics and there -- thereby they
25  could get around the rules of the repeat attendee

Page 167

1   rules because the topics would have changed.  As
2   opposed to having one speaker program, they would
3   have several speaker programs and therefore, they
4   could justify it as -- as being a different program.
5       Q.   Got it.
6       A.   To me, that is -- that is not consistent
7   with the -- you know, what the business conduct
8   manual suggested back in -- or stated back in 2016.
9   It shows kind of a desire to go beyond the letter of
10  the law -- or the letter of the compliance manual
11  and not really take it seriously.  So --
12      Q.   Got it.  And I assume -- I assume you
13  didn't just take that testimony at face value,
14  right?  You went and looked at the actual program
15  topics to see if there really was an expansion of
16  the number of topics, correct?
17      A.   I -- I did some review of it, but I didn't
18  go back and -- and -- I noted it in passing.  I did
19  not go back and do a full review.
20      Q.   Did you make a finding, based your review
21  of the record, that the number of speaker program
22  topics increased after this repeat attendee rule was
23  rolled out?
24      A.   I did not.
25      Q.   Okay.  And then if you scroll to the bottom

Page 168

1   of Mr. Meyer's e-mail, you'll see he writes, after
2   the chart there, "Robert Collett, in OLP operations,
3   recently sent an e-mail detailing how you can check
4   HCP attendance -- attendance in Centris."
5          Do you know what Centris is?
6       A.   I believe I do.  I think it's a -- it is an
7   automated attendance tracking system.  I don't know
8   if it was part of the AHM, but it was some automated
9   data control, as I understand it.
10      Q.   That's right.  And so were you aware that
11  the company implemented an electronic system that
12  automatically tracked and controlled the ability of
13  a TS to invite an attendee who had already hit their
14  cap?
15      A.   Was I aware that they had that sort of
16  system, yes, but I had a -- I was curious as to how
17  they categorized the attendees who were
18  nonreportable or who reported their credentials as
19  "other" or were not what I would consider and what
20  the business conduct would -- conduct manual would
21  consider to be appropriate attendees.  I don't know
22  how they were counted, whether they were counted in
23  Centris or --
24      Q.   Of course.
25      A.   -- you know, they allowed the secretaries

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 18 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 169

1  to go to more than three dinners.  I have no idea.
2      Q.  Well -- well, did you satisfy your
3  curiosity by taking a look at the Centris records?
4      A.  If I had access to the Centris -- Centris
5  records, I didn't -- I didn't call them by Centris.
6  I don't know if I had access to them.
7      Q.  And the issue --
8      A.  But, no, I didn't go back and do that
9  additional checking, no.
10     Q.  The issue you just raised about nurses or
11  office clerks, that has nothing to do with the
12  repeat attendee issue.  Centris just determined if a
13  specific person, by their name, had hit the cap,
14  correct?
15     A.  Well, it says "HCP attendance" in this
16  document that you showed me.
17     Q.  Uh-hm.
18     A.  So I presume they're talking about doctors,
19  prescribers, health care professionals.  I don't
20  know if it's everybody who went to the -- the
21  dinner.
22     Q.  Do you have any reason --
23     A.  Medical students, the billing people.
24     Q.  Do you have any reason to believe, as you
25  sit here today, that Gilead's automatic tracking

Page 170

1  system in Centris, to monitor for repeat attendees,
2  did not track office managers, receptionists, and
3  other attendees?
4      A.  I don't know that, so I -- I really
5  don't know.
6      Q.  Okay.  Okay.
7      A.  I mean, I just -- I couldn't speculate
8  about it.
9      Q.  All right.  And you're aware that there was
10  a hard stop in the system when you hit your
11  attendance limit, correct?
12     A.  Yes, but when was the information entered
13  into Centris?  I'm not sure.  Was that before or
14  after the event?
15     Q.  So, I get to ask the questions today.
16     A.  Oh, sorry.
17     Q.  As much as I would love to answer them.
18     A.  Sorry.
19     Q.  But I -- I appreciate the point of
20  clarification.  Let's take a look at one of these
21  sent rise documents real quick.
22     MR. LUSKEY:  So this will be Exhibit 13.
23  This is Tab 252.
24     THE STENOGRAPHER:  And I'm going to ask you
25  to slow down, please.

Page 171

1      MR. LUSKEY:  No problem.
2      (Exhibit 13 was marked for identification.)
3  BY MR. LUSKEY:
4      Q.  Have you seen Exhibit 13 before?
5      A.  I think I have seen this one before.
6      Q.  For the record, it's Gilead Purcell 275599
7  through 5646.
8      I don't believe this is on your materials
9  considered, but you believe you -- you did review
10  it?
11     A.  I -- I think I've seen something like this
12  and that's how I learned about Centris, but I'm not
13  sure.
14     Q.  Okay.  And on Slide 2 of this document, it
15  explains that Gilead was migrating from G-Event to
16  Centris, right?
17     A.  Yes.
18     Q.  And then on Slide 3, it talks about some of
19  the benefits of Centris, including improved data
20  reporting, right?
21     A.  Right.
22     Q.  All right.  And then on Slide 4, it talks
23  about what's different, and it talks about, on the
24  fourth bullet point -- or excuse me, it talks about,
25  in the fifth bullet point, the ability to check HCP

Page 172

1  program attendance limits, right?
2      A.  Yes.
3      Q.  Are technology system improvements like
4  this one typically a good idea, from your
5  perspective, in terms of improvements to a
6  compliance program?
7      A.  I think that -- yes, I think that
8  electronic recordkeeping can be very helpful, yes.
9      Q.  And sometimes they can require a
10  significant financial investment from the company,
11  right?
12     A.  Yes, uh-hm.
13     Q.  But it can lead to enhanced controls, fair?
14     A.  Sometimes.
15     Q.  Yeah.  And then if you scroll to page --
16  Slide 17, it talks about the HCP attendance cap
17  limits under business rules.  And it says the
18  business conduct manual limits HCP attendance to
19  three meetings on the same topic per calendar year.
20  It is not permissible to knowingly invite HCPs to
21  your programs when they have exceeded that limit.
22  New functionality in Centris reps can confirm
23  whether invitees exceeded the cap for the topic
24  being presented, correct?
25     A.  Yes.

Volume I
Virginia B. Evans
Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 19 of 32
United States of America vs.
Gilead Sciences, Inc.

Page 173

1    Q.  And then on Slide 18, it's a little hard to
2  read, but it's sort of a screenshot of this Centris
3  system, and in the screenshot, it shows something
4  called Centris Mobile that has an error message
5  that --
6    A.  Right.
7    Q.  -- says, "Error while validating rule.  Max
8  pre-participant.  Cap validation failed.  Count
9  limit for participation exceeded."
10    So it looks like it essentially alerts a TS
11  and blocks a TS from submitting a program with an
12  invite to you if it has already exceeded the cap; is
13  that fair?
14    A.  That's what it looks like, yes.
15    Q.  Okay.  Now, I understand your opinion that
16  some of these policy changes were not effectively
17  enforced and we will come to that.  But with respect
18  to your opinion that Gilead did no meaningful risk
19  assessment or monitoring that drove policy changes,
20  how do you reconcile that opinion with the documents
21  we've looked at, at least with respect to the repeat
22  attendee issue?
23    A.  Again, if you look at the compliance
24  program as a whole and you look at what they did
25  with respect to repeat attendance and the -- the

Page 174

1  risk that they were able to identify in 2014, it --
2  it was apparent to me, looking at all of the
3  information and documents that I've referenced in my
4  report, that for the period 2015, 2016, even into
5  2017, they were still having -- Gilead was still
6  having problems with repeat attendees at its speaker
7  programs and it -- it seemed to be the same -- among
8  other things, there were round robins going on, so
9  one physician would speak and -- and another
10  physician, maybe in his practice, would be an
11  attendee and then a month later, you'd see that
12  flip, and that -- that actually did not stop.  So,
13  whatever they did with respect to these policies
14  were not implement -- implemented and I found the
15  compliance program, therefore, to be ineffective.
16    Q.  And so it's still your expert opinion, to a
17  reasonable degree of certainty, as you sit here
18  today, now that you've had a chance to review the
19  2014 audit report and the 2015 Speaker Program
20  Working Group and the David Ralston e-mail from
21  October 2015, it's still your opinion that Gilead
22  "engaged in virtually no meaningful risk assessment
23  activities," correct?
24    A.  That's correct.
25    Q.  Okay.  Thank you.  Let's continue on.  We

Page 175

1  can take that document down.
2    You opine, in your expert report, that
3  Gilead's compliance program around speaker programs
4  and advisory boards was ineffective for a number of
5  reasons.  And you start by listing some of the
6  government guidance in this area that sort of frames
7  your opinions.  I want to walk through some of that
8  guidance.
9    So you first -- and we can flip to this
10  section of your report, just so we're all on the
11  same page.  This is in your "Criteria For Analysis"
12  section that starts on page 5.
13    So you first use the -- or you first cite
14  to the U.S. Sentencing Commission's sentencing
15  guidelines for organizations, correct?
16    A.  That's correct.
17    MR. LUSKEY:  I'll introduce that as
18  Exhibit 14, that's Tab 6.
19    (Exhibit 14 was marked for identification.)
20  BY MR. LUSKEY:
21    Q.  And you won't need to flip through these
22  yet.  I'm going to go through and introduce them all
23  and then you can refer back to them as needed.
24    Does that sound okay, Ms. Evans?
25    A.  Uh-hm.  Okay.

Page 176

1    Q.  All right.  And these guidelines apply to
2  sentencing of organizational defendants in federal
3  criminal cases, correct?
4    A.  That's correct.
5    Q.  The DOJ -- and in this case, the DOJ
6  reviewed and investigated the relator's allegations
7  about Gilead's speaker program and advisory boards,
8  correct?
9    THE STENOGRAPHER:  I need you to slow down,
10  please.  I need you to repeat that and I need you
11  to --
12    MR. SHAH:  Object to form.
13    THE STENOGRAPHER:  Wait, wait, wait.  Wait,
14  wait.  I need you to slow down and I need you to
15  repeat that question.
16    MR. LUSKEY:  Ab- -- ab- -- absolutely.
17  Everyone ready?
18  BY MR. LUSKEY:
19    Q.  In this case, the DOJ reviewed and
20  investigated the relator's allegations about
21  Gilead's speaker programs and advisory boards,
22  correct?
23    MR. SHAH:  Object to form.
24    You can answer.
25    THE WITNESS:  I don't know the answer to

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 20 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 189

1   A.  -- but, yeah, I mean, I thought that was
2   a -- they basically said there were other ways to
3   get this information and -- and, you know, although
4   we agree that peer-to-peer education may be
5   worthwhile, there are other ways to do this which
6   wouldn't raise compliance risk.
7       Q.  Yep, yep.  I was surprised by that, too,
8   but we'll come back to that.
9       All right.  So, I want you to have in front
10  of you, and I know this is hard to do on Zoom, but
11  we've got the -- one, two, three, four -- five
12  guidance documents that -- that we just walked
13  through.
14      A.  Right.
15      Q.  The Exhibit 14 is the sentence commission,
16  Exhibit 15 is the DOJ guidance, Exhibit 6 -- excuse
17  me, 16 was the 2003 OIG guidance, and then 17 and 18
18  are the two versions of the PhRMA code.  So I've got
19  some questions I want to ask you about all of that
20  guidance as a whole.
21      A.  Okay.
22      Q.  Let me start with this, on page 11 of your
23  report, you opine -- and let me refer you to this
24  specifically.  This is the third bullet point.
25      A.  Uh-hm.

Page 190

1       Q.  You opine that Gilead's compliance program
2   did not prevent repeat attendance at speaker
3   programs and ad boards.
4       Can you point me to any specific language
5   in Exhibits 14 through 18 that forbids repeat
6   attendance at speaker programs or ad boards?
7       A.  No, I cannot, but I -- I would have to say
8   that repeat attendees is something that is -- can be
9   evidence of compliance risk.  The reason being, that
10  if these are sham speaker programs or if you've got
11  people who are getting together to -- at the sales
12  representative's request to have a nice dinner and,
13  you know, thereby influencing both attendees and the
14  speaker to use the -- the product that the sales
15  representative is promoting, then I think that
16  repeat attendance does raise a red flag.
17      Q.  And -- and Ms. Evans, I fully appreciate
18  your opinion on and why it raises a compliance risk
19  and why it raises an AKS risk.  And I promise, I'm
20  going to do my -- I'm running out of time, but I'm
21  going to do my best to get to each of those modules
22  in your report.  Right now, I just have a series of
23  questions about whether Exhibits 14 through 18
24  specifically comment on any of these particular
25  issues I want to ask about, and so if you would

Page 191

1   oblige me, I would ask you to just answer that
2   question about whether it's reflected in these
3   particular documents, and then later, we will talk
4   about your broader opinions about why these raise
5   anti-kickback risks.  Is that fair?
6       A.  That's fair.
7       Q.  Okay.  All right.  So the next question I
8   have is on page 12 of your report, you opine that
9   "Gilead's compliance program did not prevent the
10  speaker programs from being social events because
11  the presentation of educational content was merely a
12  fraction of the whole promotional event."
13      Can you point me to any specific language
14  in Exhibits 14 through 18 that requires the
15  presentation at a speaker program to be a certain
16  percentage of the overall duration of the event?
17      A.  No.
18      Q.  All right.  And then on page 19 of your
19  report, you opine --
20      MR. SHAH:  Page 19?
21      MR. LUSKEY:  Yeah, sorry, page 19.  Yeah.
22      MR. SHAH:  Thanks.
23      MR. LUSKEY:  No problem.
24  BY MR. LUSKEY:
25      Q.  You opine on page 19 that Gilead should not

Page 192

1   have invited or allowed nonprescribers to attend
2   speaker program events; do you recall that opinion?
3       A.  Yes.
4       Q.  Can you point to any specific language in
5   Exhibits 14 through 18, the written guidance you
6   have cited, that prohibits pharmaceutical companies
7   from inviting or allowing nonprescribers to attend
8   speaker programs?
9       A.  Well, there is language in the PhRMA code
10  and I believe that there is language in the OIG
11  guidance about guests, spouse, spouses, and inviting
12  prescribers for whom the content is not relevant.
13      So, I believe that material is in those
14  industry codes and in the pharmaceutical compliance
15  guidance.
16      Q.  Do you believe there is any language in
17  those documents that states that nonprescribers
18  should not be allowed to attend speaker program
19  events?
20      MR. SHAH:  Object to form.
21      THE WITNESS:  Yes, I do.  Guests, spouses,
22  persons for whom the content is not relevant.
23  BY MR. LUSKEY:
24      Q.  Right.  And I'm familiar with the guests
25  and spouses language, and -- and that's a fair

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 21 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 193

1  clarification.  Let me try and ask my question
2  better.
3       Can you point to any specific language in
4  the written guidance you have cited here, Exhibits
5  14 through 18, that forbids pharmaceutical companies
6  from inviting all nonprescribers to speaker program
7  event?
8    A.  No.
9    Q.  Okay.  On page 21 of your report, you opine
10  that -- and let me see if I can point you to the
11  right passage here.  I realize I need to do a better
12  job directing you to the specific language.  One
13  moment.
14       All right.  In the second paragraph, in the
15  middle, you note that "Gilead did not engage in a
16  significant level of third-party monitoring."
17       Do you see that?
18    A.  Yes, I do.  Yes.  Uh-hm.
19    Q.  Okay.  Can you point to any specific
20  language in the written guidance you have cited that
21  requires a certain frequency of third-party
22  monitoring of speaker programs?
23    A.  I believe the pharmaceutical compliance --
24  the compliance guidance for pharmaceutical companies
25  may have something in there about monitoring and

Page 194

1  auditing.
2    Q.  You believe it speaks to or -- excuse me,
3  strike that.
4       You believe there's specific language that
5  requires a certain frequency or amount of
6  third-party monitoring?
7    A.  I'm not sure it says third-party
8  monitoring, and I don't know -- I can't recall, at
9  this point, whether it specifically goes into the
10  frequency of monitoring, but -- so, no, I can't
11  recall.
12    Q.  Okay.  And then on page 31 of your report,
13  you talk about how Gilead should not have let sales
14  managers attend advisory board meetings, right?
15    A.  That's right.
16    Q.  Can you point to any specific language in
17  the written guidance you've cited that prohibits
18  sales managers from attending advisory board
19  meetings?
20    A.  No, I don't think I can.  However, I did
21  find language in the business conduct manuals that
22  would have said that salespersons should not be --
23  sales personnel should not attend advisory board
24  meetings.
25    Q.  Except for regional directors, correct, if

Page 195

1  approved?
2    A.  That's what it said, yes.
3    Q.  Right.  On page 38 of your report --
4    A.  Okay.
5    Q.  -- you opine that having the sales and
6  marketing business units select speakers and
7  determine the business needs of speakers is a
8  suspect characteristic for potential AKS violations,
9  right?
10    A.  That's correct.
11    Q.  I want to put aside the 2020 special fraud
12  alert for a moment, which we'll come back to.
13       Can you point to any specific language in
14  the written guidance you have cited, Exhibits 14
15  through 18, that was in effect during the relevant
16  period here, that prohibits sales and marketing
17  employees from playing a role in selecting speakers?
18    A.  I would have to go back through the OIG
19  compliance guidance for pharmaceutical
20  manufacturers, but I believe there is language in
21  the -- in those regulatory guidance documents'
22  language that concerns the use of sales -- the sales
23  side of a business to determine who the speaker
24  should be --
25    Q.  Well --

Page 196

1    A.  -- and --
2    Q.  -- let's let you review that.  I don't want
3  to hide the ball here.  So let's pull up that
4  document.  I believe the one you cited was Tab 3,
5  right, the OIG guidance?
6    A.  Yes.
7    Q.  Sorry, Exhibit 16 is what I meant.  And
8  we'll go off the record and give you -- give you a
9  moment to review it.
10    A.  Okay.  Can I drive this now or --
11    Q.  I hope so.
12    A.  Maybe not.
13       THE VIDEOGRAPHER:  Would you like me to
14  take us off the record, Counsel?
15       MR. LUSKEY:  Yeah, let's go off the record.
16  Thank you.
17       THE VIDEOGRAPHER:  Okay.  The time is
18  3:16 p.m.  We are off the record.
19       (Lunch break was taken from 3:16 p.m. until
20  3:27 p.m.)
21       THE VIDEOGRAPHER:  Okay.  We are back on
22  the record and the time is 3:27 p.m.
23  BY MR. LUSKEY:
24    Q.  Ms. Evans, now that you've had an
25  opportunity to review Exhibit 16 off the record, can

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 22 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 197

1  you point to any specific language in the written
2  guidance you have cited that prohibited sales and
3  marketing employees from having a role in selecting
4  speakers?
5      A.  No.
6      Q.  All right.  On page 50 of your report, you
7  opine that one of the reasons Gilead's compliance
8  program was ineffective was that it failed to
9  prevent some speaker program events from featuring
10  alcohol.
11          Do you recall that opinion?
12      A.  I do.
13      Q.  Can you point --
14      A.  And I'm sorry, what was -- what was your
15  question again?
16      Q.  Oh, I haven't asked it yet.
17      A.  Oh.
18      Q.  I just asked if you recalled that opinion.
19  Sorry.
20      A.  Yeah, uh-hm.
21      Q.  Can you point to any specific language, in
22  the written guidance you have cited, that forbids
23  serving alcohol at speaker program events?
24      A.  No.
25      Q.  And you also opine, in this section of your

Page 198

1  report, that the $125 meal cap was excessive in
2  certain jurisdictions, correct?
3      A.  Yes.
4      Q.  Can you point to any specific language, in
5  any of the written guidance you have cited, that
6  sets a value threshold on the food that should be
7  served at speaker program events?
8      A.  No, just that it be modest by local
9  standards.
10      Q.  Okay.  And you also opine in your report
11  that one of the reasons Gilead's compliance program
12  was ineffective was because some speakers were
13  compensated for two hours of service, even though
14  the presentation portion of the program lasted for
15  less than two hours, correct?
16      A.  I'm sorry, can you tell me that again?
17      Q.  Yeah, no problem.
18          You also opine in your report that one of
19  the reasons Gilead's compliance program was
20  ineffective was that it allowed some speak- -- it
21  compensated some speakers for two hours of service,
22  even though the medical or scientific presentation
23  portion of the program lasted for less than two
24  hours, correct?
25      A.  Yes, I felt that that was a compliance

Page 199

1  issue.
2      Q.  Can you point to any specific language in
3  the written guidance you have cited that requires
4  pharmaceutical companies to only compensate for the
5  portion of the program where the speaker is actually
6  presenting?
7      A.  I don't think so, no.
8      Q.  Okay.  And on pages 59 through 62 of your
9  report, you opine that one of the reasons that
10  Gilead's compliance practices were ineffective was
11  because the business conduct department was not
12  involved with the actual operation of the speaker
13  programs or ad boards, correct?
14      A.  Correct.
15      Q.  Can you point to any specific language in
16  the written guidance you have cited that requires
17  the compliance department to be directly responsible
18  for the operation of speaker programs or advisory
19  boards?
20      MR. SHAH:  Object to form.
21      THE WITNESS:  Well, the -- yes.  With
22  respect to the HHS-OIG compliance guidance for
23  pharmaceutical manufacturers, there is language that
24  states that one of the things that the compliance
25  department should be doing is assessing the risk and

Page 200

1  then determining whether or not there are policies
2  that deter that risk or to prevent that risk from
3  occurring, and whether or not the policies were
4  implemented, and, finally, whether or not they were
5  followed.
6      Q.  Okay.
7      A.  So, yes, I think there is language in -- in
8  the guidance --
9      THE STENOGRAPHER:  I'm sorry, you said yes?
10      THE WITNESS:  I'm sorry?
11      THE STENOGRAPHER:  So, yes, I think...
12      THE WITNESS:  There is language in the
13  guidance that refers to the compliance department or
14  business conduct department being involved in
15  monitoring and addressing the risk for certain
16  activities.
17  BY MR. LUSKEY:
18      Q.  Can you point to any specific language, in
19  the written guidance you have cited, that addresses
20  minimum attendee requirements at speaker program
21  events?
22      A.  No, I don't believe so.
23      Q.  Can you point to any specific language, in
24  the written guidance you have cited, that states
25  that office staff are inappropriate attendees at

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 23 of 32
United States of America vs.
Gilead Sciences, Inc.

1  speaker program events?
2      A.   Again, I would point out to the -- I would
3  point you to the PhRMA code and to the OIG
4  compliance guidance for pharmaceutical manufacturers
5  where it says that guests are not appropriate and
6  that the speaker program should be designed to
7  impart clinical, medical, scientific information
8  designed to help the patients, and certainly the
9  business conduct manual stated that office staff
10 were not appropriate attendees.
11     Q.   Can you cite to anything in those
12 documents, the written guidance documents, that
13 suggests, for instance, nonprescribing nurses are
14 categorically inappropriate attendees at speaker
15 program events?
16     A.   No.
17     Q.   Okay.  Is there anything -- any specific
18 language, in the written guidance that you have
19 cited, that prohibits incentive compensation plans
20 that are tied to prescription volumes?
21     A.   The OIG compliance guidance for
22 pharmaceutical manufacturers makes a point of
23 explaining that when sales representatives have
24 compensation plans that are tied to their sales and
25 they're also dealing with referral sources or

1  prescribers, that this is a high risk area and so it
2  should be something that is managed and controlled
3  and reviewed, audited.
4      Q.   Understood.  So that language does not
5  prohibit incentive compensation programs that are
6  tied to prescription volumes?
7      A.   That are tied to what?  I'm sorry.
8      Q.   Prescription volumes.
9      A.   No, I don't think it does.
10     Q.   All right.  Is there --
11     A.   Doesn't use those words.
12     Q.   -- is there anything in the written
13 guidance you have cited that requires live
14 monitoring of advisory boards?
15     A.   I don't think so.
16     Q.   Okay.  Is there any specific language, in
17 any of the written guidance you have cited, that
18 includes a cap for advisory board payments?
19     A.   I don't believe so.
20     Q.   Does the PhRMA code specifically allow for
21 district managers to nominate speakers, subject to
22 medical review and approval?
23     A.   No, I don't believe the PhRMA code talks
24 about regional managers or regional directors.  I'd
25 have to go back and look at it, but I don't think it

1  uses that language.
2      Q.   Let's take a look at Exhibit 18, the 2009
3  PhRMA code.  If we look at Question 16 in that
4  document.  Take a moment to review it.  And then you
5  can review the answer, too.
6      A.   And what's the question?
7      Q.   So have you had a chance to review the
8  answer yet?
9      A.   Nope.
10     Q.   Take your time.
11     A.   Okay.
12     Q.   The question considers a scenario in which
13 prospective speakers would be selected based on
14 recommendations of the company's district managers
15 and an assessment of their qualifications by the
16 company's medical or scientific personnel, correct?
17     A.   It does.
18     Q.   And the answer states that that satisfies
19 the provisions in the code that require potential
20 speakers to be selected based on defined criteria
21 such as medical expertise, knowledge, and
22 experience, correct?
23     A.   It -- I don't agree with your
24 characterization of the answer.  The answer doesn't
25 really talk about the propriety of the regional

1  director making the nomination.  It's more is there
2  a process by which a speaker is nominated and then
3  approved by the medical scientists and is there --
4  are there predefined criteria, such as medical
5  expertise, knowledge, and experience and -- and
6  other sorts of qualifications.  It doesn't really
7  talk about the propriety of a sales regional
8  director.  Maybe it's a marketing regional director.
9  Maybe it's a -- I don't know.  You know, what
10 regional director.
11     Q.   Okay.
12     A.   So I -- I hesitate to agree with your
13 characterization of that answer.
14     Q.   Okay.  We could take that document down.
15     Finally, in your report, you also cite the
16 OIG special fraud alert from November 2020, correct?
17     A.   Right.
18     Q.   And -- and that would not have been issued
19 until after the relevant period in this case;
20 correct?
21     A.   That's correct.
22     Q.   And so, for instance, some of the things
23 that you talked about earlier that might have been
24 surprising, like, Gilead would have had no way to
25 know about that guidance during the relevant period

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 24 of 32

United States of America vs.
Gilead Sciences, Inc.

1  speaker programs, was too small and it was
2  understaffed.
3      Q.  What evidence did you rely on to conclude
4  that Gilead's compliance department was strikingly
5  similar to the compliance department described here
6  overseen by a former paralegal at Teva?
7      MR. SHAH:  Object to the form.
8      THE WITNESS:  But that's just one part of
9  the opinion, but -- so, I -- as I said, I thought
10  that in -- in both cases, the pharmaceutical company
11  had a compliance program that was just simply too
12  small and spread too thin to have an effective
13  oversight role with respect to the speaker programs.
14  For example, it would have been nice, at some point,
15  to see -- have information that a compliance
16  department staff member, maybe not even an attorney,
17  but someone was actually present at one of the
18  speaker programs.  I know that they were present at
19  speaker training, but it was pretty clear that --
20  that even at the end of the speaker trainings, the
21  speakers didn't know, for example, was an
22  appropriate attendee.  So I just -- I -- it was my
23  opinion, based on the totality of the evidence that
24  I reviewed, that both Teva and Gilead had compliance
25  departments that were too small to really handle

1  the -- the risk.
2  BY MR. LUSKEY:
3      Q.  How large was Gilead's business conduct
4  department?
5      A.  Well, the business conduct --
6      MR. SHAH:  Object -- object to the form.
7  You can answer.  Sorry.
8      THE WITNESS:  I'm sorry.
9      As I understand it, from Erica Chien, there
10  was one person over a seven-year period who was a
11  full-time -- detailed full time to that particular
12  franchise, the HBV franchise.  There were -- there
13  was one person in the beginning, 2013, and that
14  eventually expanded to, I think, seven individuals
15  over a seven-year period, but those individuals had
16  responsibilities for the other franchises as well.
17  So there was really just one person who was dealing
18  with HBV.
19  BY MR. LUSKEY:
20      Q.  That's how you read -- that's how you read
21  Ms. Chien's testimony?  You believed that at the
22  beginning of the review period, there was just one
23  business conduct person who had any responsibility
24  for HBV?
25      MR. SHAH:  Object to form.

1      THE WITNESS:  That was my understanding,
2  yes.
3  BY MR. LUSKEY:
4      Q.  Okay.  And you said that she --
5      A.  That was in -- I'm sorry, go ahead.
6      Q.  You said that business conduct was present
7  at speaker training, but not at speaker programs.
8  You know that business conduct was present at
9  advisory boards as well, correct?
10      A.  They might attend an advisory board
11  meeting.  I have a vague recollection of something
12  about that, but I can't recall the specifics of it,
13  Mr. Luskey.
14      Q.  So as you sit here today, you don't have
15  sufficient information to conclude whether business
16  conduct was frequently at advisory board meetings?
17      MR. SHAH:  Object to form.
18      THE WITNESS:  I -- I would -- I would be --
19  well, strike that.
20      I -- I don't know how often they were at
21  advisory board meetings.  They might have attended
22  sporadically, but I don't -- I don't recall it being
23  a regular occasion.
24      MR. LUSKEY:  Okay.  Let's take a look at
25  the Gilead business conduct department here.  We

1  will introduce as Exhibit 20, Tab 96.
2      (Exhibit 20 was marked for identification.)
3  BY MR. LUSKEY:
4      Q.  And in Tab 96, we are going to flip to
5  Slide 2.  Thank you.  We can blow that up a little
6  bit.
7      A.  Oops.
8      Q.  Ms. Evans, for the record, Exhibit 20 is a
9  slide deck, "Business Conduct Planning and
10  Principles, Process and Documentation."  The version
11  I have --
12      A.  Excuse me, I'm sorry, I'm not -- on my
13  screen, I have a copy of my report.  I don't know
14  what happened there.
15      Is that --
16      Q.  We'll get that fixed.
17      A.  Okay.
18      MS. RAND:  Can you let me know if you can
19  see it now?
20      THE WITNESS:  I can't.
21      MR. LUSKEY:  Huh.  Let's go off the record.
22  We'll fix it.
23      THE WITNESS:  Okay.
24      THE VIDEOGRAPHER:  The time is 4:01 p.m.
25  We are off the record.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 25 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 221

1    (Short recess was taken from 4:01 p.m.
2  until 4:01 p.m.)
3    THE VIDEOGRAPHER:  Back on the record.  The
4  time is 4:01 p.m.
5  BY MR. LUSKEY:
6    Q.  Ms. Evans, you see on Slide 2 here, this is
7  a -- essentially an org chart of the U.S. Business
8  Conduct Team, and it's dated January 2016.  If you
9  scroll to the bottom of that slide, Marnee will show
10  you that.
11    A.  Okay.
12    Q.  Do you see that?
13    A.  Yes.
14    Q.  Is this a document that you reviewed in
15  connection with your work in this matter?
16    A.  I don't think I did.
17    Q.  Okay.  This is the first time you're seeing
18  this business conduct org chart?
19    A.  I -- I can't recall.  I remember seeing the
20  names, but -- sorry.
21    Q.  No problem.
22    And there's David Ralston at the top, the
23  associate general counsel of business conduct,
24  right?  We spoke about him earlier?
25    A.  Right.

Page 222

1    Q.  He was the one that sent out that repeat
2  attendees policy change in October 2015; does that
3  sound right?
4    A.  Yes.
5    Q.  All right.  And then you see he has a few
6  direct reports.  Those are all counsel roles, right,
7  so all lawyers?
8    A.  Right.
9    Q.  And then you'll see that one of those
10  lawyers is Erica Chien, whose deposition you
11  reviewed, correct?
12    A.  Right.
13    Q.  So she was --
14    A.  Yes.
15    Q.  -- senior counsel in the liver disease
16  unit; is that right?
17    A.  Yes.
18    Q.  Overseeing the HBV therapeutic area,
19  correct?
20    A.  Yes.
21    Q.  And then below her, you've got an
22  individual named Greg Sicilian, who was counsel in
23  the HBV area; is that right?
24    A.  Yes.
25    Q.  Is that a name you recognize from seeing

Page 223

1  some of those business conduct presentations at the
2  mid-year meetings and things like that?
3    A.  I do.
4    Q.  All right.  And that's -- so that's a
5  business conduct lawyer assigned specifically and
6  exclusively to HBV, correct?
7    A.  I don't know that.
8    Q.  You didn't know -- you -- that's the first
9  time -- you weren't aware that he was only assigned
10  to HBV?
11    A.  No.  I was not.
12    Q.  Okay.  And then Erica Chien is another
13  business conduct lawyer who's assigned essentially
14  to two liver areas, HCV and HBV; is that fair?
15    A.  Right.
16    Q.  Okay.  And then on the right side of the
17  slide over here, you see some names like Dale Mehr
18  and Courtney Desmond.  Are those names that you
19  recognize from your review of compliance materials
20  in this case?
21    A.  The only two that I -- I remember seeing
22  information about were the -- the monitoring
23  managers, Courtney Desmond and Dana Emadz- --
24    Q.  Uh-hm.  You certainly understood that they
25  played a role in the HBV therapeutic area, correct?

Page 224

1    A.  No, I understood that they received the
2  monitoring reports from Polaris and I don't know
3  what happened to them after that point, but I -- I
4  never had any sense that either Ms. Desmond or Dana
5  provided the information back down to the sales
6  representatives or their directors to help them
7  manage the speaker programs more efficiently, more
8  compliantly, no.
9    Q.  Right.  And -- and you've already testified
10  that you didn't review the privilege log before
11  your -- offering your opinion in this case and
12  hadn't seen the dozen of examples of Courtney
13  Desmond sending monitoring reports to the NACRC and
14  otherwise that we looked at today, correct?
15    MR. SHAH:  Object to form.
16    THE WITNESS:  I remember seeing the
17  privilege log.
18  BY MR. LUSKEY:
19    Q.  And so -- but back to my question, based on
20  your review of materials in this case, is it your
21  understanding that Courtney Desmond and Dana
22  Emadzadeh had some responsibility for the HBV
23  therapeutic area?
24    A.  It was my understanding that they had
25  responsibility for all franchises with respect to

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 26 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 257

1  believe it was the testimony -- testimony of Marc
2  Aquino about one of his therapeutic specialists who
3  wanted to add a Dr. Raven- -- Ravensteyn, I think
4  was his name, because he was a believer and I think
5  we'll make him a speaker, is what she says, so that
6  he'll believe even more.  And the point of her
7  business plan was to increase his prescriptions.
8        There were also other instances in the
9  documents that I reviewed, the testimony and the
10  evidence, that indicated to me that making a
11  physician a speaker was something that was going to
12  be beneficial to the speaker and would also be
13  something that could be used to increase their
14  willingness to prescribe Viread or VEM- -- VEMLIDY,
15  depending on what drug was being promoted.
16       **Q.  Right, and this is your chance to get all**
17  **those instances out there.**
18       **You've given me Dr. Ravensteyn, and the**
19  **Marc Aquino example, and then the Dr. Iskandarani**
20  **e-mail, which we've just reviewed.**
21       **Any others?**
22       A.  Well, I'm sure there are others and they're
23  in my report and I have -- I did not name all of the
24  documents that I reviewed in my report, did not cite
25  them all, but I found lots of evidence to suggest

Page 258

1  that that's what was going on.
2       **Q.  But I've reviewed your report, these are**
3  **the documents that you cite in this section to**
4  **substantiate your point that speaker selection was**
5  **being used to induce prescriptions.  Are there --**
6  **are there any -- is there anything else out there,**
7  **other than what you've told me about?**
8       MR. SHAH:  Object to form.
9       THE WITNESS:  Well, certainly the
10  conversation that you started with, sir, when you
11  were citing to -- I believe it was Ms. Groome and
12  one of her TSs who said, you know, no talks -- no
13  scripts, no talks.
14       MR. LUSKEY:  Good point, I agree with you.
15  That is -- that is a pretty clear example.
16       All right.  Let's keep marching through.
17  BY MR. LUSKEY:
18       **Q.  And you cite to Ms. Larson's deposition**
19  **testimony with respect to this particular exhibit as**
20  **well relating to Dr. Iskandarani, right?**
21       A.  Right.
22       **Q.  You recall that Ms. Larson testified --**
23  **testified that increasing his prescript- --**
24  **prescriptions and his market share was not one of**
25  **the reasons he was nominated to be a speaker,**

Page 259

1  correct?
2       A.  I recall that she testified something to
3  that effect, but I don't recall any specifics.
4       **Q.  Okay.  And you don't -- and you don't**
5  **believe her, correct?**
6       A.  I tried not to make a judgment as to the
7  veracity of what people testified to.  I just look
8  at all the facts and the circumstances, and maybe
9  she was mistaken.  I'm not going to say that
10  somebody was being untruthful.  So...
11       **Q.  Well, it -- but in this instance, you have,**
12  **in fact, concluded that you don't believe her,**
13  **correct?**
14       MR. SHAH:  Object to form.
15       THE WITNESS:  I didn't say that.
16  BY MR. LUSKEY:
17       **Q.  Well -- well, she testified that one of the**
18  **reasons Dr. Iskandarani was added was not to**
19  **increase his market share and you've seen -- and**
20  **you've concluded in your report that it was, right?**
21       A.  Yes, I did.
22       **Q.  Okay.  And is there any contrary deposition**
23  **testimony from anyone in this case that supports**
24  **your opinion?**
25       A.  About Dr. Isk- --

Page 260

1       Q.  Correct.
2       A.  -- Iskandarani?
3       Q.  (Counsel nods head.)
4       A.  I don't know.  I haven't seen much else.  I
5  didn't run Dr. Iskandarani's name through the list
6  and stuff, so, no, I can't think of anything at this
7  point.
8       Q.  All right.  So you looked at that
9  attachment and based on your interpretation of that
10  attachment, you concluded that Ms. Larson's
11  testimony was not credible?
12       A.  I did not conclude that.
13       Q.  Then how did you reach your opinion that
14  the reason he was added was, in fact, to increase
15  his prescriptions?
16       A.  I had a difference of opinion.
17       Q.  A difference of opinion with Ms. Larson's
18  under-oath testimony?
19       A.  That's correct.
20       Q.  Okay.  And you're certainly not making any
21  credibility assessments as an expert, right?
22       A.  No, I would -- no, I'm not.
23       Q.  Okay.  And then you cite, in your report at
24  page 36, a number of these opinion leader engagement
25  spreadsheets.  I'm not going to pull them all up.  I

Case 2:17-cv-03523-MAK     Document 234-2     Filed 06/14/21     Page 27 of 32

Volume I                                               United States of America vs.
Virginia B. Evans                                          Gilead Sciences, Inc.

Page 293

1    A.  I didn't --
2        MR. SHAH:  Object to form of the question.
3        THE WITNESS:  I did not make a -- an
4    assessment as to credibility.  I --
5        MR. LUSKEY:  Okay.
6        THE WITNESS:  -- I understood that some
7    people may be incorrect in their testimony; they may
8    have misunderstood things.  I don't know, but what I
9    can say is that if you have a compliance program and
10   whether or not people are abiding by the terms of
11   the compliance program is secret, then that's not
12   exactly a fulsome way to make the -- the program
13   effective.
14   BY MR. LUSKEY:
15       **Q.  Okay.  And you -- you're aware that**
16   **business conduct was involved in speaker training,**
17   **obviously, right?**
18       A.  Yes.
19       **Q.  Okay.  And -- and I think you've already**
20   **testified that you are aware that business conduct**
21   **at least occasionally attended advisory boards.  You**
22   **said you didn't know how frequently, right?**
23       A.  Right, I recall some testimony, yeah.
24       **Q.  All right.  Your opinion that the marketing**
25   **department, and not the business conduct department,**

Page 294

1    oversaw the speaker programs and advisory boards,
2    what government, OIG, DOJ guidance would you point
3    to to suggest that the legal or compliance
4    department should run speaker programs?
5        A.  I don't -- I -- I -- I can point you to
6    the -- excuse me, HSS-OIG compliance guidance for
7    pharmaceutical manufacturers which put the
8    compliance officer and the compliance department
9    kind of at the head, if you will, of a compliance
10   program, and it is ultimately their responsibility,
11   under the OIG guidance, to be -- to make sure that
12   the compliance program is supported by policies,
13   that there are policies covering the risks, that the
14   policies are risk based, that the risks -- excuse
15   me, that the policies are being followed and
16   implemented, and if there are missing policies, then
17   to address those and -- and address the new -- newly
18   arising risks.
19           And in this case, I did not see that.  I
20   saw therapeutic specialists and others who are left
21   to their own discretion and were biased because they
22   were trying to get the prescribers that they were
23   nominating as speakers to write prescriptions so
24   they could get more compensation.  They were biased.
25   I didn't see any controls over that.  They were

Page 295

1    basically out there on their own, trying to figure
2    out how to do something that, frankly, ran counter
3    to the business conduct manual, which --
4        **Q.  Understood.**
5        A.  -- said invite prescribers.
6        **Q.  Understood.**
7           **And are you familiar with OIG guidance that**
8    **the involvement of sales and marketing personnel is**
9    **key to a successful compliance program?**
10       A.  Yes.
11       **Q.  And you agree with that, correct?**
12       A.  I do.
13       **Q.  Your testimony here today is not that sales**
14   **and marketing should have no role in terms of**
15   **applying and enforcing compliance programs and**
16   **policies as they relate to speaker programs, right?**
17       A.  That is not my testimony.
18       **Q.  Okay.  All right.  A few questions about**
19   **venues.  I'm going to cover this pretty quickly.**
20          **So you opine in your report that Gilead's**
21   **compliance program was ineffective because it --**
22   **some of the venues provided an entertainment**
23   **experience for the attendees.**
24          **This is on page -- that's the language you**
25   **use on page 12.  What did you mean by an**

Page 296

1    entertainment experience?
2        A.  Well, I think we talked about the open bar
3    on March -- in March of 2005 for Dr. Hee, but there
4    were other, you know, sort of high-end -- I think
5    there was one at The Palm where the steaks were $100
6    and lobsters and -- you know, the experience of
7    dining out at a fancy restaurant is in -- in -- it
8    may be, in itself, entertainment and that's not
9    consistent with the PhRMA code, which says that
10   meals should be modest and entertainment is not
11   appropriate.
12       **Q.  Okay.  So when you said that Gilead**
13   **provided an entertainment experience, you were**
14   **referring to instances like that where it was a nice**
15   **dinner?**
16       A.  Yes.
17       **Q.  Okay.  And further on, on page 12 of your**
18   **report, you opined that Gilead held speaker programs**
19   **and ad board meetings at high-end venues.**
20          **What did you mean by that?**
21       A.  Well -- excuse me.  I think places like
22   Ruth's Chris and The Palm, you know, very nice
23   restaurants.
24       **Q.  What is the basis of your opinion that Ruth**
25   **Chris is a world-renowned, high-end restaurant?  I**

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 28 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 301

1  believe, was explaining that it was no longer
2  necessary to limit speaker programs or ad boards --
3  or speaker training, maybe, to venues that were
4  either casinos, golf clubs, golf courses, or -- I
5  forget the other one. I don't think it was resorts,
6  but it might have been.
7      Q.  Out of the 3,300 or so speaker programs at
8  issue in this case, how many did you identify that
9  were held at casinos, golf clubs, or resorts?
10     A.  I didn't make a calculation.
11     Q.  You just -- you just cited to that one in
12  your report, correct?
13     A.  But there were -- there were many others.
14     Q.  Oh, really?  Tell us about the others.  I
15  haven't seen any others.
16     A.  Oh, I'm sorry, casinos, golf clubs, or
17  resorts?
18     Q.  Yes.
19     A.  Oh, I'm sorry, no.  I misunderstood you.
20     Q.  It was just that one, correct?
21     A.  That I'm aware of, yes.
22     Q.  That one is on page 50 of your report.  You
23  opine that Gilead allowed exceptions to the speaker
24  program policies prohibiting meals at fancy venues,
25  golf clubs, or resorts and then you cite to

Page 302

1  Ms. Larson's deposition testimony about a speaker
2  program that was done with the Philippine Nurses
3  Association.  Does that ring a bell?
4      A.  Oh, I thought I was talking about the one
5  at the Innisbrook Golf and Spa Resort.  Is that the
6  same one?
7      Q.  It is.  I believe we're talking about the
8  same event, that's correct.
9      A.  Okay.
10     Q.  And you recall that that event was done in
11  conjunction with the Philippine Nurses Association,
12  a third party?
13     A.  I have a vague recollection.  Yes.
14     Q.  You remember that when Ms. Larson was asked
15  about this particular event, she said that Gilead
16  had no control over a responsibility for where the
17  association was having this meeting?
18     A.  I don't recall that, sir.
19     Q.  Okay.  And in that one instance, business
20  conduct considered and accepted the exception; is
21  that correct?
22     A.  That's my understanding, yes.
23     Q.  Did you find any other examples where
24  business conduct allowed an exception to the golf
25  clubs or resorts policy?

Page 303

1      A.  Not that come to mind immediately, so, no.
2      Q.  All right.  You opine about the $125 per
3  person meal cap, including food.  Your -- your
4  testimony is that you -- you view that as excessive;
5  is that correct?
6      A.  Yes.
7      Q.  The other companies that you have counseled
8  in this area, do they also have meal caps?
9      A.  Yes.
10     Q.  Approximately what were those meal caps?
11     A.  About the same.
12     Q.  Okay.
13     A.  1 -- 125.  Yep.
14     Q.  Did you say -- did you tell them they
15  needed to bring that number down; it was too high?
16         MR. SHAH:  Object to form.
17         THE WITNESS:  No, I didn't; however, were I
18  to provide counsel to organizations that were in a
19  different geographic region, I might reconsider.
20  BY MR. LUSKEY:
21     Q.  What should that number have been,
22  from your -- in your expert opinion?
23     A.  I'm sorry?
24     Q.  What should that meal cap per person number
25  have been, in your expert opinion?

Page 304

1         MR. SHAH:  Object to form.
2         THE WITNESS:  I don't know.  I'm not a
3  meeting planner, but, you know, it would seem to me
4  that in certain areas, you could have a modest
5  dinner for less than 125.
6  BY MR. LUSKEY:
7      Q.  Okay.  That would include the dinner and
8  the beverage and the tax and the tip, correct?
9      A.  That's correct.
10     Q.  Okay.  And did you review the -- the
11  deposition transcript of Kimberly Groome where she
12  testified that the next company she went to after
13  Gilead had $145 meal cap?
14     A.  No, I did not -- I -- I may have read that,
15  but I don't remember it.
16     Q.  I assume you would also opine that that is
17  excessive, correct?
18     A.  I'm sorry?
19     Q.  I assume that you would -- you would opine
20  that that meal cap is also excessive, correct?
21     A.  If it was national and not consistent with
22  modest-level standards, yes.
23     Q.  Did you review Ms. Groome's testimony where
24  she testified that she thought Gilead actually did a
25  nice job of enforcing the meal cap limits?

1      A.   No, I don't -- I did review it, but I --
2   can't recall that.
3      Q.   Do you disagree with that testimony?
4      A.   No, I think they actually went over the
5   limit pretty frequently.
6      Q.   And when they went over the limit, did you
7   identify examples of e-mail notifications that would
8   go out, including business conduct, and coaching,
9   even when they went over the limit by only a few
10  dollars?
11     A.   I did see e-mails involving coaching and
12  admonitions to therapeutic specialists that they
13  were over the meal limit and -- and exchanges, you
14  know, with their supervisors, yes.
15     Q.   Okay.  All right.  Let's take a break and
16  go off the record.
17     A.   Okay.
18          THE VIDEOGRAPHER:  Okay.  The time is
19  6:02 p.m.
20          We are off the record.
21          (Short recess was taken from 6:02 p.m.
22          until 6:09 p.m.)
23          THE VIDEOGRAPHER:  Okay.  We're back on the
24  record and the time is 6:09 p.m.
25  ///

1   BY MR. LUSKEY:
2      Q.   Ms. Evans, on page 22 of your report, you
3   opine that Ms. Larson acted either recklessly or
4   willfully in a certain respect.  What did you mean
5   by "recklessly"?
6      A.   Find where we are.
7      Q.   Oh, yeah, it's the last sentence of the
8   first full paragraph.
9          MR. SHAH:  On page 22?
10         MR. LUSKEY:  Correct.
11         THE WITNESS:  Yes.  Well --
12  BY MR. LUSKEY:
13     Q.   And just before you answer, my only
14  question is what you meant -- how you define the
15  term "recklessly."
16     A.   So, she either knew that the business
17  conduct manual prohibited persons who were
18  nonprescribers from attending the speaker programs
19  and just decided to do it anyway, or she -- or she
20  ignored the fact intentionally because she had some
21  sort of animus, I don't know, or some sort of
22  intent.  So I just don't know the answer to that
23  question, but "recklessly" would be knew it and just
24  didn't pay attention to it.
25     Q.   Okay.  And "willful" would be that she

1   acted intentionally in bad faith, essentially?
2      A.   Right.
3      Q.   And that's an opinion that you plan to
4   offer in this case at trial?
5      A.   Well, I'm not going to offer either
6   recklessly or willfully 'cause I don't know, but
7   certainly the business conduct manual stated that
8   prescribers should be invited to speaker programs,
9   and not nonprescribers and not office staff
10  receptionists.  So she either ignored that or maybe
11  she didn't know about it and didn't check.  I don't
12  think so, but --
13     Q.   Okay.  And you -- you've reviewed the
14  testimony of Erica Chien, Gilead's person most
15  knowledgeable and 30(b)(6) witness on this topic,
16  who -- who testified that the business conduct
17  manual did not prohibit invitations to
18  nonprescribers, correct?
19     A.   That's not the way I read the business
20  conduct manual, sir.
21     Q.   I understand that.  That wasn't my
22  question.  My question was whether you read Erica
23  Chien's testimony on that topic.
24     A.   I believe I did, yes.
25     Q.   Okay.  But you -- and notwithstanding that

1   testimony, you think -- you still think Ms. Larson
2   was either reckless or willful for having that same
3   view?
4      A.   Yes, I think so.
5      Q.   Okay.  And I asked you a second ago if that
6   was the testimony you plan to offer in this case and
7   I'm not sure I understood your answer.
8      A.   Well, I -- I don't know what her motivation
9   was in ignoring what the business conduct manual
10  plainly prohibited, so -- or whether she was
11  mistaken in her understanding of it, so I just don't
12  know the answer to that.  I couldn't testify whether
13  she was reckless or willful.  It -- it just appears
14  to me that she was either one or the other.  And
15  that's --
16     Q.   So that is not -- so that is not an opinion
17  you plan to offer in this case, even though it's in
18  your expert report?
19     A.   That she was either reckless or willful?
20     Q.   That's correct.
21     A.   No, I -- I stand by that.  Yes, I would --
22     Q.   Oh, I -- go on.
23     A.   Yeah, I would stand by that, yes.
24     Q.   I know you stand by it.  My question is:
25  Is it an opinion you plan to offer in this case?

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 30 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 313

1   A.  Right.  Uh-hm.
2   Q.  Okay.  And is there anything in this
3   document that shows Gilead conducting a
4   return-on-investment analysis for ad boards?
5   A.  Well, I -- I probably misspoke in my -- in
6   my report when I said "return on investment."  I
7   think what I was pointing to is that they were
8   looking at the prescribing behavior and prescribing
9   patterns and -- and trying to get people who had not
10  been to an ad board and a speaker program to -- to
11  nominate them as speakers.  So I guess my point in
12  the report was that they were, in fact, tracking the
13  prescriptions and the prescribing behavior and that
14  volume and value.
15  Q.  Okay.  So you agree with me that there's
16  nothing in this document that shows Gilead
17  performing a return-on-investment analysis for
18  advisory boards, correct?
19  A.  In that document, no.
20  Q.  Okay.  Have you seen any documents in this
21  case that substantiate your opinion that Gilead
22  performed return-on-investment analysis for --
23  analyses for ad boards?
24  A.  I can't recall anything specific at this
25  point.

Page 314

1   Q.  Okay.  You could take this one down.
2   You earlier testified that Gilead did this
3   on a regular basis.  No documents you can point to
4   to substantiate that testimony?
5   A.  Well, I would go back to my testimony that
6   on a regular basis -- I think many folks testified
7   that Gilead knew on a weekly, maybe even a daily
8   basis, what particular prescribers in a territory
9   were doing, in terms of not only the Gilead product,
10  but also their competitor products, and -- and they
11  did judge -- in fact, I think Leilani Larson
12  testified that there was, in fact, a
13  return-on-investment analysis done at some point.  I
14  don't recall if it was ad boards or speaker
15  programs, but --
16  Q.  Are you -- are you thinking of the
17  return-on-investment analyses -- analysis that she
18  testified to about speaker program attendees, the
19  one that you cite in your expert report?
20  A.  I believe that might be it.  And -- yeah, I
21  just -- I'm sorry, I can't recall.
22  Q.  No problem.  Certainly nothing
23  inappropriate about doing a return-on-investment
24  analysis for attendees, right?
25  A.  Well, if your business conduct manual says

Page 315

1   don't do return on analysis of speakers because that
2   is -- and the reason behind that policy is because
3   it's going to make it look like you're selecting
4   speakers on the basis of the volume and -- and value
5   of their prescriptions, and then you turn around and
6   do a -- an analysis of the prescribing behavior of
7   everybody who was attend -- was an attendee, at the
8   same time sweeping in those speakers who were also
9   attendees -- or those attendees who were also
10  speakers, I got that backwards, then you would, in
11  fact, be doing a return-on-investment analysis that
12  would capture the speakers' prescribing behavior.
13  Q.  Not after they spoke, but after they
14  attended an event, right?
15  A.  Well, somehow it made -- I mean, they were
16  speakers, so they must have spoken --
17  Q.  Yeah.
18  A.  -- must have been speakers at some point
19  because they're also attendees.
20  Q.  Right.  Right.  So going back to your
21  opinion, that you state in a -- on page 30 of your
22  report, that "Gilead conducted a
23  return-on-investment analysis of ad board
24  participants," I'm not hearing any clear bases for
25  that opinion as we sit here today.  Is there

Page 316

1   anything you can point me to?
2   MR. SHAH:  Object to the form.
3   THE WITNESS:  I can't recall.
4   BY MR. LUSKEY:
5   Q.  Okay.  No problem.
6   Earlier we talked, in passing, briefly
7   about the Sam Lee investigation.  Let's just cover
8   that briefly.  You -- you cite to the Sam Lee
9   allegations on page 37 of your report, and you note
10  on page 37 of your report that you believe that
11  these allegations were not responded today
12  appropriately, correct?
13  A.  That's right.
14  Q.  And you -- you certainly understand that
15  that investigation was conducted under privilege at
16  Gilead, correct?
17  A.  Yes.
18  Q.  And so you don't have any visibility into
19  how many employees were interviewed, correct?
20  A.  Right.
21  Q.  And you wouldn't know which documents the
22  Gilead legal team reviewed in order to investigate
23  those allegations, right?
24  A.  That's correct.
25  Q.  Do you know how long the investigation

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 31 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 317

1  took?
2    A.  No, I don't.
3    Q.  Okay.  And --
4    A.  I don't know that there was an
   investigation, so...
6    Q.  Well, you -- you do 'cause you reviewed the
7  Sam Lee deposition transcript, right?
8    A.  Yes.
9    Q.  Okay.  And you recall him talking --
10   A.  Okay, yeah.  Okay.
11   Q.  That's fair.  You recall him talking about
12  him being interviewed --
13   A.  Right.
14   Q.  -- and getting the closeout letter?
15   A.  Right.
16   Q.  Okay.  How can you offer a reliable expert
17  opinion that these allegations were not responded to
18  appropriately, if you don't have access to that
19  privileged internal investigation file?
20       MR. SHAH:  Object to form.
21       THE WITNESS:  All right, so the point that
22  I was making here is that when Sam Lee made these
23  allegations against his therapeutic specialist's
24  partner, Ms. Chien, they were specific -- they were
25  corroborated by some information that he had also

Page 318

1  provided and some information that was independent
2  of Mr. Lee's statements, so not knowing, under
3  privileged, what Gilead did with that information,
4  what we do know is that the information that was
5  provided by Mr. Lee should have caused additional
6  review of -- in my opinion, should have caused
7  additional review of the programs that were being
8  hosted by Catherine Chan, at the very least, and if
9  that had happened, perhaps some of the -- the more
10  egregious speaker programs would have been
11  determined at that point, some of the more egregious
12  compliance violations.
13 BY MR. LUSKEY:
14   Q.  It -- it sounds like you're saying that the
15  allegations in the e-mail looked serious and
16  credible to you and it was surprising that there
17  wasn't a negative finding and corrective actions at
18  the end of it; is that your testimony?
19   A.  No.  My testimony --
20       MR. SHAH:  Object to form.
21       Go ahead and answer.
22       THE WITNESS:  I'm sorry.  My testimony is
23  that a -- an efficient, effective compliance program
24  would have taken those allegations made involving
25  Ms. Chien and used them as the basis to perhaps do a

Page 319

1  sample of the speaker programs that were hosted by
2  Ms. Chien, perhaps do a sample of the speaker
3  programs involving particular speakers, you know,
4  parse the information down a little bit and use it
5  from a compliance standpoint, not only just
6  investigating for the compliance breach, but using
7  the information to come up with policies, to come up
8  with, you know, some reports that could be, without
9  violating privilege, disseminated down to the
10  therapeutic specialists so that this kind of
11  behavior wouldn't happen again.
12 BY MR. LUSKEY:
13   Q.  And you don't -- you don't know whether
14  Gilead did such an audit of Ms. Chien's programs, do
15  you?
16   A.  I -- I have not seen anything to indicate
17  that that was the case, no.
18   Q.  Right.  And is it appropriate, from your
19  perspective, for a company to conduct internal
20  investigations in a privileged fashion?
21   A.  It is, yes.
22   Q.  Have you ever done that?
23   A.  I have done that.
24   Q.  All right.  And you say that --
25   A.  I have also -- never mind.

Page 320

1    Q.  Okay.  On page 86 of your report, you say
2  that you sort of re- -- reiterate Mr. -- or you
3  summarize Mr. Lee's allegations and you note that
4  Mr. Lee -- sorry.  You say:  "Contemporaneous
5  records confirm that the dates and 'speakers'
6  identified by Mr. Lee were accurate.  Mr. Lee also
7  described an event in November 2013 at which close
8  to 20 inappropriate attendees were present."
9       Do you see that?
10   A.  Yes.
11   Q.  And you read Mr. Lee's deposition testimony
12  where he said he got that wrong, correct?
13   A.  Yes.  Uh-hm.
14   Q.  Okay.  All right.  And when you describe
15  this investigation as superficial, how are you
16  able -- how are you able to conclude it was
17  superficial without knowing what investigative steps
18  were taken?
19   A.  Well, I did not -- the only information
20  that I had, other than Mr. Lee's deposition, was the
21  investigation of Ms. Chien and sort of the -- I
22  believe Mr. Johnson may have testified about it as
23  well, and everybody took the position that, well,
24  this was thoroughly investigated and there was no --
25  there was nothing to what Mr. Lee was saying.

Volume I
Virginia B. Evans

Case 2:17-cv-03523-MAK    Document 234-2    Filed 06/14/21    Page 32 of 32

United States of America vs.
Gilead Sciences, Inc.

Page 329

1  and spouse, and partners prohibition.
2      Q.  No, no, that -- that doesn't answer the
3  question.  I understand that those languages
4  saying -- there's language saying that, you know,
5  you can't have guests, and family members, and
6  spouses.
7      My question is:  Are you aware of any
8  language, in any guidance coming from the
9  government, that says only prescribers are allowed
10  to attend speaker programs?
11     A.  I am not aware of any specific guidance
12  that says that, no.
13     Q.  Okay.
14         MR. SHAH:  Hey, Randy, not to interrupt,
15  but -- and I certainly don't have Spencer's gift for
16  precision, but -- I have very few gifts in general,
17  but we probably don't need to speak about that, but
18  I think we're at the seven-hour mark, so...
19         MR. LUSKEY:  Understood.  Really appreciate
20  your time today, Ms. Evans.  Those are all the
21  questions I have.
22         THE WITNESS:  Thank you, sir.
23         MR. SHAH:  Thanks.  I don't have any
24  questions for the witness.
25         Randy, it was nice to see you.

Page 330

1          MR. LUSKEY:  You as well.
2          MR. SHAH:  Monica, Spencer, thank you for
3  your time.
4          And everyone, be well.
5          Randy, hopefully no -- no vomiting
6  incidences at home tonight for your sake.
7          MR. LUSKEY:  I hope you're right about
8  that.  Take care.
9          THE VIDEOGRAPHER:  Off the record, Counsel?
10         MR. LUSKEY:  Yeah.
11         THE VIDEOGRAPHER:  Okay.  The time is
12  6:40 p.m.
13         This is the end of the videotaped
14  deposition of Virginia Evans, Volume 1, dated
15  June 1, 2021.  You're off the record.
16         MS. RAND:  Monica, this is Marnee from
17  Orrick.  I just wanted to check --
18         Sorry, this is just for Monica.  Are you
19  going to be sending a rough transcript tonight?
20         THE STENOGRAPHER:  I will be sending it
21  later tonight.  I have an appointment, but I will
22  send it late tonight.
23         MS. RAND:  Should I put my e-mail in the
24  chat for you to send it to, or do you have our work
25  e-mails?

Page 331

1          THE STENOGRAPHER:  I do have some e-mails.
2  I don't know if I have your e-mail, but I can find
3  it on the Orrick website.
4          Mr. Shah, would you like a rough copy?
5          MR. SHAH:  Yes, thank you.  And you have my
6  e-mail?
7          THE STENOGRAPHER:  Yes, I believe so.
8          MS. RAND:  I've just added our e-mails in
9  the chat.
10         THE STENOGRAPHER:  Thank you.
11         (THE VIDEOTAPED EXPERT DEPOSITION OF
12         VIRGINIA B. EVANS WAS CONCLUDED AT
13         6:40 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 332

1  STATE OF CALIFORNIA  )
                        )
2  COUNTY OF SONOMA     )
3          I, Monica Lepe-Georg, a Certified Shorthand
4  Reporter of the State of California, do hereby
   certify:
5
6          That prior to being examined, the witness
7  in the foregoing proceedings was by me duly sworn to
8  testify to the truth, the whole truth, and nothing
9  but the truth;
10         That said proceedings were taken remotely
11  before me at the time and places therein set forth
12  and were taken down by me in shorthand and
13  thereafter transcribed into typewriting under my
14  direction and supervision;
15         I further certify that I am neither counsel
16  for, nor related to, any party to said proceedings,
17  not in anywise interested in the outcome thereof.
18         Further, that if the foregoing pertains to
19  the original transcript of a deposition in a federal
20  case, before completion of the proceedings, review of
21  the transcript [  ] was [ X ] was not requested.
22         IN WITNESS WHEREOF, I have this date
   subscribed my name.
23  Dated:  June 7th, 2021
24
25         MONICA LEPE-GEORG, No. 11976